Gonzalo: Murillo, Lawful man
c/o #10694-002, Federal Correctional Institution
Post Office Box 3007
1299 Seaside Avenue
Terminal Island, at Californila

Near [90731]

In Propria Persona

RECEIVED

2006 OCT 23  A 10: 17

## IN THE DISTRICT COURT OF THE UNITED STATES

## IN THE MIDDLE DISTRICT OF THE NORTHERN ALABAMA REPUBLIC

UNITED STATES OF AMERICA, ex rel.,
Gonzalo: Murillo, in esse, One of the people
of the Californila Republic and the uniited
States of America,

        Intervenor,

GONZALO MURILLO, and any and all derivatives
and or variations thereof in spelling said
name,

        Petitioner,

vs.

Ira DeMent, in esse, d/b/a UNITED STATES
DISTRICT COURT JUDGE, MIDDLE DISTRICT OF
THE ALABAMA REPUBLIC,

Charles S. Coody, in esse, d/b/a UNITED
STATES MAGISTRATE JUDGE, for the COURT,

Debra P. Hackett, Jane & John Doe's 1-4,
COURT CLERK'S,

Terry F. Moorer, in esse, d/b/a ASSISTANT
UNITED STATES ATTORNEY, Representing the
UNITED STATES OF AMERICA,

Leura G. Canary, in esse, d/b/a ACTING
UNITED STATES ATTORNEY, Representing the
UNITED STATES OF AMERICA,

        Respondents/Appellee's.

) Case No. 2:06 CU 765-ID
) Appeal Fr: USDC 2:00-CR-00126-
) ID - CSC
)
)
)
)
)
)
)
)
)
)
)
) BRIEF IN SUPPORT, WITH MEMO-
) RANDUM, TO FILE SUPPLEMENTAL
) PLEADING UNDER F.R.APP.P.
) RULE 22, FOR FRAUD ON THE
) DISTRICT COURT'S BEHALF,
) BAD FAITH AND MALICIOUS
) PROSECUTION
)
)
)
)
)
)
)
)
)
)
)
)
)
)

COMES NOW, UNITED STATES OF AMERICA, ex rel., Gonzalo: Murillo, in esse,

One of the people of the Californila Republic, as the Intervenor and Federal

Witness herein, and as Authorized Representative and Attorney in Fact for the

Petitioner, GONZALO MURILLO, and any and all other deviations or variations

thereof in the spelling of said name, and moves this Court for leave to File

Page 1

a Supplemental Pleading pursuant to the FEDERAL RULES OF APPELLATE PROCEDURE
(F.R.APP.P), RULE 22. This Request is made in good faith and Appellant's
asserts FRAUD on the District court's Behalf, Bad Faith, malicious prosecution,
resulting in finvoluntary servitude and unlawful incarceration.

## I. INTRODUCTION

### A. JURISDICTIONAL STATEMENT

1. On August 24, 2006, Intervenor, Gonzalo: Murillo, in esse, ex rel.,
UNITED STATES OF AMERICA, and the Petitioner, GONZALO MURILLO, filed with the
district court of the United States, in the Central District of the California
Republic (DCUS), for which said was transfered to the UNITED STATES DISTRICT
COURT IN THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION (USDC), Intervenor
and Petitioner raised jurisdictional and fundamental rights challenges under
FEDERAL RULES OF CIVIL PROCEDURE (FRCP), RULE 60(b)(4) to the conviction and
sentence in federal Criminal Proceeding 2:00-CR-00126-ID-CSC.

2. OnSeptember 18, 2006, Intervenor received the Recommendation of the
Magistrate Judge, document #: 2-1, filed September 14, 2006, denying and
recommending dismissal as Intervenor had failed to obtain the requisite order
form the Eleventh Circuit Court of Appeals for a second or succesive § 2255
motion.

3. On October 3, 2006, the Court filed the Intervenor's and Petitioner's
Response to the Recommednations of Charles S. Coody seeking vacation of a
void order, which all the above were stamped "received," instead of filed.

4. On 10/04/06, received on 10/09/06 , the Court, dismissed the RULE 60(b)(4) motion
made by the Intervenor and Petitioner, through misconstruction of the pleadings,
with reference to CASTRO vs. UNITED STATES, 124 s.ct. 786, 157 l.ed.2d 778
(2004), and in violation of said mischarterfization.

5. On October 19, 2006, Intervenor and Petitioner, mailed their Notice
to Appeal, for which under GONZALES vs. CROSBY, 545 u.s. ---, 162 l.ed.2d 480
(2005), Rule 60(b) does not require a certificate of appellabfility.

6. Under IN RE MERRIAM, 36 N.E. 479, 141 N.Y. 479, affirmed, UNITED STATES vs. PERKINS, 41 l.ed.2d 287; 20 C.J.S. § 1785; see also HOOVEN & ALLISON vs. EVATT, 324 u.s. 652, 89 l.ed. 1252, 65 s.ct. 870 (1945), wherein the meaning of the United States is Congress Assembled, Ten square miles around the District of Columbia or any forts, arsenals, or needful buildings, nowhere is it defined as the UNITED STATES OF AMERICA; moreover, the Court went on to state that the UNITED STATES OF AMERICA, was a federal government business, with no immunity whatsoever.

7. The jurisdiction of this Court is invoked under Title 28 of the UNITED STATES CODE, SECTIONS 1291, 1330, 1331, 1332, 1333, 1343(a) (3), and 1357, FRCP RULE 60(b)(4), F.R.APP.P. RULES 22, 23 and 44, FEDERAL RULES OF THE SUPREME COURT (FRSC), RULES 17, 18, 19 and 36.

B. CERTIFICATE OF INTERESTED PARTIES

1. Gonzalo: Murillo, in esse, Lawful man, One of the people of the Cailfornia Republic and the united States of America, ex rel., UNITED STATES OF AMERICA, the Intervenor herein and Federal Witness, and as Authorized Representative and Attorney in Fact for the Petitioner, GONZALO MURILLO.

2. Ira DeMent, was at all times relevant hereto, in esse, d/b/a UNITED STATES DISTIRCT COURT JUDGE, Representing the UNITED STATES OF AMERICA in federal criminal docket number 2:00-CR-00126-ID-CSC.

3. Charles S. Coody, was at all times relevant hereto, in esse, d/b/a UNITED STATES MAGISTRATE JUDGE, Representing the UNITED STATES OF AMERICA n

the federal criminal docket number 2:00-CR-00126-ID-CSC in a USDC.

4. Debra P. Hackett, Jane & John Doe's 1-4, were at all times relevant hereto, in esse, d/b/a USDC Court Clerk's.

5. Terry F. Moorer, was at all times relevant hereto, in esse, d/b/a ASSISTANT UNITED STATES ATTORNEY, Representing the UNITED STATES OF AMERICA in these instant proceedings.

6. Leura G. Canary, was at all times relevant hereto, in esse, d/b/a ACTING UNITED STATES ATTORNEY, Representing the UNITED STATES OF AMERICA, in criminal proceeding 2:00-CR-00126-ID-CSC.

C. ISSUES PRESENTED TO THE COURT

1. Whether the Federal Government lacked Federal Legislative, Territorial or Admiralty Jurisdiction in over the Locus Quo ?

2. Whether the Federal Government's charging Instruments were Fatally Defective in this Cause ?

3. Whether the Federal Government Failed to Establish Federal Interstate Commerce Nexus to this Cause ?

4. Whether, Title's 18 and 21 of the UNITED STATES CODE, Unconstitutional and if so do said Codes apply to Appellant's ?

5. Whether, under Title 28 of the UNITED STATES CODES, SECTION 547(2), a Special Agent of the FEDERAL BUREAU OF INVESTIGATION, DRUG ENFORCEMENT ADMINIS-TRATION, or a MULITI-TASK FORCE may initiate, with Congressional Authority, a Federal Prosecution, styled: a Criminal Complaint with Supporting Affidavit ?

6. Whether, according to APPRENDI, BOOKER, BLAKELY, and AMELINE, Judge found facts, such as the 15 Kilograms and role enhancements, recoommended by

Page 4

the pre-sentence investigation report, which were made by a probation officer, not proved to a jury, not admitted by the Intervenor or Petitoner, not mentioned in the indictment can be used to enhance the sentence, when so challenged at sentencing, such that the burden was on the Intervenor and Petitioner to disprove this alleged facts ?

7. Whether, the Court Clerk's can presumptively stamp "received," on a pro-se petitioner's pleadings instead of "filed? " And if so by what authority ?

8. Whether, the constitution of the United States, for the united States of America, without the United States, a public federal governmental corporation, Article III, Section 2, Clause 3, mandates upon the Court trial by jury for all crimes can be abordgated by a FEDERAL RULE OF CRIMINAL PROCEDURE, RULE 11 ?

9. Whether, there is a difference between the UNITED STATES DISTRICT COURT and the district court of the United States and if so was the difference in criminal proceeding 2:00-CR-00126-ID-CSC violative of due process and equal protection of the laws of the United States and the constitution ?

10. Whether, a contract exists for obligation for performance under the UNITED STATES CODE, introduced into the record made in criminal proceeding 2:00 -CR-00126-ID-CSC, in order to substantiate jadmiralty jurisdiction ?

11. Whether, the Grand Jury was ever presented with Federal Subject-Matter jurisdiction under the Interstate Commerce Clause in order to sustain a secert indictment in 2:00-CR-00126-ID-CSC ?

      //
      //
      //
      //
      //

D. MEMORANDUM IN SUPPORT OF DISMISSAL WITH PREJUDICE OF 2:00-CR-126

[1.] Defendant contends that the 'U.S. ATTORNEY' misrepresented to the grand jury that the federal government lacked federal Legislative, territorial, or Admiralty jurisdiction in over the Locus quo. The defendant argues that there is no presumption in favor of jurisdiction, where the basis for jurisdiction must be affirmatively shown on the face of the record. See HARTFORD VS. DAVIS. 16 s.ct. 1051 (1896). The exclusive Legislative jurisdiction of the federal government is not addressed in principle to subject matter, but to geographical Location. See UNITED STATES VS. BEAVENS. 16 U.S. (3 wheat) 336 (1818). It is automatic that the prosecution must always prove (Legislative, Territorial or Admiralty) jurisdiction over the geographical Location whereon the alleged prohibitive acts were purported to have been committed, otherwise a conviction could not be sustained. See UNITED STATES VS. BENSON. 495 F.2d 481 (1946). Federal criminal jurisdiction is never presumed; and must always be proven, and can 'never be waived'. See UNITED STATES VS. ROGERS. 23 F. 658 (D.C. Ark.1885). IN CRIMINAL PROSECUTION WHERE THE FEDERAL GOVERNMENT IS A MOVING PARTY IT MUST NOT ONLY ESTABLISH OWNERSHIP OF THE PROPERTY WHICH THE CRIME(S) ALLEGEDLY OCCURRED, BUT THEY MUST ALSO PRODUCE DOCUMENTATION THAT THE STATE HAS CEDED THE JURISDICTION OF THAT PROPERTY TO THEM (ON VIEW OF THE SUPREME COURT) in fort LEAVENWORTH RAILROAD VS. IOWA, 114 U.S. 525 (1885). [No] jurisdiction exists in the United States to enforce federal criminal Laws until CONSENT TO ACCEPT JURISDICTION OVER ACQUIRED LANDS HAVE BEEN PUBLISHED and filed on behalf of the United States as provided and filed in 40 U.S.C. S255, and the fact that the state authorized the federal government to take and exercise jurisdiction was immaterial. See ADAMS VS. UNITED STATES, 319 U.S. 312, 63 Supreme Court 1122, 87 L.Ed. 1421 (1943).

[2.] Defendant contends that jurisdiction is more than a technical concept and is a 'constitutional requirement,' see UNITED STATES VS. JOHNSON. 337 F.2d 180 (affmd) 86 s.ct. 749, 383 U.S. 169, 15 L.Ed 681 cert. den. 87 s.ct. 44, 134 and at 385 U.S. 846, 17 L.Ed 2d 117. In the United States, there are [TWO] separate and distinct kinds of jurisdiction: The jurisdiction of the states within their own territorial boundaries, and then federal jurisdiction. Broadly speaking, the state jurisdiction encompasses the Legislative power to regulate within the territorial govern real and personal property, individuals, and enterprises within the territorial boundaries of any given state. In contrast, federal jurisdiction is extremely [LIMITED]: In July of 1776 after declaring their independence, the new states possessed all their sovereignty, power, and jurisdiction over [ALL] soil and people in their respective territorial limits, This condition of supreme sovereignty of each state over all property and persons within the borders thereof continued not the adoption of the Articles of confederation. In Article II, it is expressly stated: "Each state retains its sovereignty freedom and independence, and every power, of jurisdiction and right which is not by this confederation, expressly delegated to the United States, In Congress Assemble."

[3.] Defendant contends as the history of the confederation government has shown each state was indeed sovereign and independent to the degree that it made the central government created by the confederation ineffectual. These defects of the confederation

government strained the relation between and among the states and the remedy became calling a constitutional convention. The representatives who assembled at Philadelphia in May of 1787 to attend the constitutional convention met for the primary purpose of improving the commercial relations among the states, although the product of the convention produced more than this. No intention was demonstrated for the states to surrender in any degree, the jurisdiction so possessed by the states at the time, and indeed the constitution as finally drafted continued the same territorial jurisdiction of the states as existed in the Articles of confederation. The essence of this retention of each states jurisdiction is embodied in the constitution at Article I section 8 clause 17 of the constitution of the united States of America, which reads as follows: "To exercise exclusive legislation in all cases whatsoever over such districts (not exceeding ten miles square) as may by cession of particular states, and acceptance of congress becomes the seat of the government of the United States, and to exercise like authority over [ALL] places purchased by the consent of the Legislature of the states in which the same shall be for the erection of forts, magazines, arsenals, dock-yards and other needful buildings [40 U.S.C. 3112]."

[4.] Defendant contends that the reason for the inclusion of this clause in the constitution was and is obvious. Under the Article of confederation, the states retained full and complete jurisdiction over lands and persons within their borders. Since authority of the states would be supreme and exclusive therein. 3 wheat at 350, 351.

[5.] Defendant contends that in holding that the state of Massachusetts had no jurisdiction over the crime the court held: "We answer, without hesitation, the jurisdiction of a state is co-existence with its territory; co-existence with its Legislative power." 3 wheat at 386, 387. "It is observable that the power of the exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be free act of the states. It is difficult to compare the two sections together, without feeling a conviction not to be strengthened by any commentary on them, that is describing the judicial power, the framers of our constitution had not in view any cession of territory or, which is essentially the same of general jurisdiction." 3 wheat at 338.

[6.] Defendant contends that thus BEAVENS, the court established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive Legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire constitution of the United States. One year later the supreme court of New York was presented with the same issue, of whether the state of New York had jurisdiction over a murder committed at Fort Niagara, a federal fort. In PEOPLE VS. GODFREY, 17 johns 225 N.Y. (1819), that court held that the fort was subject to the jurisdiction of the state since the LANDS THEREFORE HAD NOT BEEN CEDED TO THE UNITED STATES, The rationale of it's opinion stated: "To oust this state of its jurisdiction to support and maintain it's Laws and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is [CLEARLY] and exclusively cognizable by the laws and courts of the United States, In the case already cited, Chief Justice Marshall observed that to bring the offense within the jurisdiction of the courts of the Union, "It must have been committed out of the jurisdiction of any state." It is not (he says) the offense committed but the place in which

it is committed, which must be [OUT] of the jurisdiction of the state. 17 JOHNS, at 233 (emphasis added)

[7.] Defendant contends that the case relied upon by this court was the UNITED STATES VS. BEAVENS, SUPRA. At about the same time that the New York Supreme Court rendered its opinion in godfrey, a similar situation was before a federal court, the only difference being that murder was committed in and occurred on lands that had been ceded to the United States. In UNITED STATES VS. CORNELL, 2 manson 60, 1 cir. (1819). The court held that the case fell within federal jurisdiction describing such jurisdiction as follows: "But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not itself oust the jurisdiction or sovereignty of such state over land purchases. It remains until the state has RELINQUISHED ITS AUTHORITY OVER THE LANDS EITHER EXPRESSLY OR BY NECESSARY IMPLICATION. When therefore a purchase of land for any of these purposes is made by the national government and the state legislature had given its consent to the purchases, the lands so purchased by the very terms of the constitution are completely ousted." 2 MASON, at 63.

[8.] Defendant contends that almost 18 years later the U.S. Supreme Court again was presented a case involving the distinction between state and federal jurisdiction. In NEW ORLEANS VS. UNITED STATES. 35 u.s. (10 pet) 662 (1836). The United States claimed title to property in New Orleans likewise claimed by the city, the court, after holding that, title to the subject lands was owned by the city, the court addressed the question of federal jurisdiction and states: "Special provisions is made in the constitution for the cession of jurisdiction from the state over places where the federal government shall establish forts, or other military works. And it is only in these places of the United States where I can exercise a general jurisdiction." 10 pet at, 737.

[9.] Defendant contends that in NEW YORK VS. MILN, 36 u.s. (11 pet) 102 (1837), the question before the court involved the attempt by the city of New York to assess penalties against the master of a ship for his failure to make a report as to the persons his ship brought to New York. As against the master's contention that the act was unconstitutional and that New York had no jurisdiction in the matter, the court held: "If we look at the places of its operation, we find it to be within the territory, and therefore, within jurisdiction of New York. If we look at the person on whom it operates he is found within the same territorial and jurisdiction." 36 u.s. at 133. "They are these: That a state has the same undeniable and unlimited jurisdiction over all persons and things within its limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the constitution of the United States. That by virtue of this it is not only the right, but the burden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare by any and every act of Legislation which it may deem to be conducive to these ends; Where the power over the particular subject, or the manner just stated. That all those powers which relate to merely municipal legislation or what may perhaps more properly be called internal police are not thus surrendered or restrained and that consequently in relation to these the authority of a state is completely unqualified and exclusive." 36 u.s. at 139.

[10.] Defendant contends that some eight years later, in POLLAR VS. HAGAN, 44 u.s. (3 How) 212 (1845), the question of federal jurisdiction was once again before the court. This case involved a contest of the title to real property, with one of the parties

claiming a right to the disputed property via u.s. patent; the lands in question were situated in mobile, Alabama adjacent to mobile bay, the court held: "We think a proper examination of this subject will show that the United States [NEVER] held any municipal sovereignty, jurisdiction or right of soil in any territory of which Alabama or any of the new states were formed." 44 u.s. at 221. "Because the United States has [NO] constitutional capacity to exercise municipal jurisdiction, sovereignty or eminent domain within the limits of a state or elsewhere, except in cases which it is expressly granted." 44 u.s. at 228, 229. "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law." 44 u.s. at 228, 229.

[11.] Defendant contends that the single most important case regarding the subject of federal jurisdiction appears to be FORT LEAVENWORTH R.CO. VS. IOWA, 114 u.s. 525, (1885) 995, which set forth the law on this point of federal jurisdiction, fully. There the railroad company property, which passes through, Fort Leavenworth federal enclave, was being subject to taxation by Kansas, and the company claimed an exemption from the state taxation. In holding the company is properly taxed, the courts carefully explained federal jurisdiction within the states: "The consent of the states to the purchase of lands within them for the special purpose named is however, essential, under the constitution, to the transfer of the jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, political jurisdiction be ceded to them in some other way is simply that of an ordinary propriety. The property in that case, unless used as a government, is subject to the legislative authority and control of the states equally with the property of private individuals. 114 u.s. at 531.

[12.] Defendant contends that the constitution of the United States created a government, which has jurisdiction over certain enumerated subject matter. It is only in these areas that congress can enact Laws, and when they do, the federal courts are to enforce the law. [When laws do not come from an enumerated power, the federal courts are to prevent the U.S. government or congress from applying them.]

[13.] Defendant contends that the federal constitution prescribes what the "jurisdiction" of the federal government is by the enumerated powers.
- That government can regulate foreign and interstate commerce,
- Fix the standards of weights and measurements,
- Establish uniform laws on bankruptcies,
- Coin money and provide for the punishment of counterfeiting of the coins and securities of the United States,
- Protects the arts and sciences by copyrights and patents,
- Punish for piracies and felonies committed on the high seas,
- Raise and support an army and navy,
- Lay and collect direct taxes by appointment,
- Indirect taxes by exercises, duties, or imports.

[14.] Defendant contends that this is the extent of the legitimate jurisdiction of the federal United States government. It is only in these areas, supra, that a "crime (or offense) against the federal United States" can exist, and this is so only when congress actually passes a law in one of these areas. But an act committed within a state, whether for good or bad purpose, or whether with honest or a criminal intent, [CANNOT] be made an offense against the United States, unless it has some relation to the execution of a power congress, or to some matter within the jurisdiction of the United States.

[15.] Defendant contends that UNITED STATES VS. FOX, 95 u.s. 670, 672 (1877). The courts of the United States, merely by virtue of this grant of judicial power, and in the [ABSENCE] of legislation by congress, have no criminal jurisdiction whatsoever. The criminal jurisdiction of the courts of the United States is wholly derived from the statutes of the United States. MANCHESTER VS. MASSACHUSETTS. 139 u.s. 240, 262 (1890); UNITED STATES VS. FLORES, 289 u.s. 137, 151 (1932). Acts of congress, as well as the constitution, must generally unite to give jurisdiction to a particular court. UNITED STATES VS. BEDFORD, 27 fed. Cas., p.91, 103 case no. 15, 867 (1847).

[16.] Defendant contends that the federal courts only have jurisdiction in matters involving an "offense against the United States," and [NOTHING] can be an offense against the United States unless it is made so by congressional Act pursuant to the U.S. constitution. There is [NO] other source from which congress can get authority to make law, including the common law. Thus, it has been that. "There is no federal common law."

[17.] Defendant contends that a better way of stating this is to say, "There are no common law offenses (or crimes) against the United States. UNITED STATES VS. BRITTON. 108 u.s. 199, 206 (1882); UNITED STATES VS. EATON, 144 u.s. 677, 687 (1891); UNITED STATES VS. GRADWELL. 243 u.s. 476, 485 (1916); DONNELLEY VS. UNITED STATES. 276 u.s. 505-511 (1927); JEROME VS. UNITED STATES. 318 u.s. 101, 104 (1942); NORTON VS. UNITED STATES. 92 fed.2d 753 (1927). In other words, the common law is not a source for criminal jurisdiction as it is in the states. UNITED STATES VS. GROSSMAN. 1 fed. 2d 941, 950-51 (1924).

[18.] Defendant contends that by "jurisdiction" is meant the authority of the federal courts to hear and decide a matter. Thus, it is more correct to say that, "Federal courts have no jurisdiction of common law offenses, and there is no jurisdiction of common law offenses, and there is no abstract pervading principle of the common law of the Union under which we (federal courts) can take jurisdiction. STATE OF PENNSYLVANIA VS. THE WHEELING E. BRIDGE CO. 13 How. (54 u.s.) 518 (1851).

[19.] Defendant contends that if congress tries to make a common law offense a crime (such as libel, drugs, theft, burglary, murder, kidnapping, arson, rape, abortion, assault, fraud, etc.) which have [NO] relation to an enumerated power, it would simply be an "unconstitutional" act. Congress can declare NOTHING a crime except where it is based upon a delegated power. The only thing that can be a crime against the "United States" is that which comes from the U.S. constitution. These concepts were stated early on by the U.S. Supreme court: "In relation to crimes and punishments, the objects of the delegated power of the United States are enumerated and fixed. Congress may provide for the punishment of counterfeiting the securities and current coin of the United States, and may define and punish piracies and felonies committed on the high seas, and offenses against the law of Nations. Art.***, but there is [NO] reference to a common law authority. Every power is [A] matter of definite and positive grant and the very power that a grant cannot take effect until they are exercised through the medium of a law. The UNITED STATES VS. WORRALL. 2 Dall. (2 u.s.) 384, 391 (1798).

[20.] Defendant contends that a constitution is not to be made to mean one thing at one time and another at some subsequent time when the circumstances have so changed, as perhaps to make a different rule in the case to seem desirable. A principle share of the benefit expected from written constitutions would be lost if the rules they establish were so flexible as to bend to circumstances, or be modified by public opinion. [A] court or legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath (28 U.S.C. 453-18 U.S.C. 1621) and public duty; and if its course could become precedent, these instruments would be of little avail. What a court is to do, therefore, is to declare the law as written. T.M. Cooley A Treaties on the constitutional limitations. 5th Ed., pp. 54, 55, rather than be swayed by political ambition and unlawful usurpation of police powers.

[21.] Defendant contends that [JUDGES] have no more right to decline the exercise of jurisdiction that is given, than to usurp that which is not given. The one or the other would be treason to the constitution. COHENS VS. VIRGINIA. 6 wheat (19 u.s.) 264, 404 (1821).

[22.] Defendant contends that the district court erred in not determining jurisdiction prior to entertaining the cause.

## **STANDARD OF REVIEW**

The court's duty to resolve the jurisdiction of the court, regardless of who brings the action, the court must make a legal finding as to its authority to take venue and jurisdiction, before the court moves to entertain the cause before it. See, 20 Am Jur 2d 60, 377. "THE GENERAL RULE IS THAT A PROCEEDING CONDUCTED OR DECISIONS MADE-BY A COURT ARE LEGALLY VOID WHEN THERE IS AN ABSENCE OF JURISDICTION OVER THE SUBJECT MATTER. A COURT DEVOID OF JURISDICTION OVER THE CASE CANNOT MAKE A DECISION IN FAVOR OF EITHER PARTY, CANNOT DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM, AND CANNOT RENDER A SUMMARY JUDGMENT. AS A DECISION WOULD BE ON THE MERITS OF THE ACTION. IT CAN ONLY DISMISS THE CASE FOR WANT OF JURISDICTION. HOWEVER, A COURT CAN SET ASIDE ORDERS IT MADE BEFORE THE WANT OF JURISDICTION WAS DISCOVERED, AND A JUDGMENT BY A COURT WITHOUT JURISDICTION OVER SUBJECT MATTER CAN BE SET ASIDE AND VACATED AT ANY TIME BY THE COURT THAT RENDERED IT." (In Part)

[23.] Defendant asserts that the UNITED STATES by and through its agent, the 'U.S. Attorney', lost its jurisdiction, once it failed to determine (prove) jurisdiction to hear this case at bar before proceeding with a plea/trial within the US District Court. (The U.S. District Court had an obligation to compel the United States to prove jurisdiction in the best interest of justice).

[24.] Defendant contends that the question-challenging jurisdiction, was [NEVER WAIVED] by the defendant. It is well settled in the law that when jurisdiction of the court and of the United States is challenged, thus "ONUS PROBANDI IS THE ACTOR". Onus probandi burden of proving the burden of proof: "The strict meaning of the onus probandi," is that, if no evidence is adduced by the party on whom the burden is cast, the issue must be found against him, DAVIS VS. ROGERS, 1 Houst (del) 44. "Where jurisdiction is challenged it must be proved." HAGAN VS. LAVINE, 415 u.s. 528

(1974). Because it is not sufficient that jurisdiction of the United States courts may be inferred argumentatively from averments in the pleadings it follows that the necessary factual predict may not be gleaned from the briefs and arguments themselves; This principle of federal jurisdiction applies whether that case is at the stages, or at the appellate stage.

[25.] Defendant contends that the court and government has [NOT] been granted jurisdiction through the constitution of the [u]nited States of America, to adjudicate matters beyond the legislative of the United States. The courts and the government have [FAILED] to offer proof, or making findings and conclusions of law, as to the jurisdiction in the above-alleged criminal action. "A COURT CANNOT PROCEED AT ALL IN ANY CASE WITHOUT JURISDICTION BUT MUST ANNOUNCE THE fact and dismiss the cause." see EX PARTE MCCARDLE, 7 wall 506, 19 Led. 264. Before considering each of the standing theories, it is appropriate to restate certain basic principles that limit the power of every federal court. Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the constitution (their contract/compact) and statutes enacted by congress pursuant thereto. See e.g. MARBURY VS. MADISON, 1 cranch 137, 173-180, 2 L.Ed. 60 (1803). For that reason, every federal appellate court has a special obligation to "Satisfy itself not only of its jurisdiction, but also that of the lower courts in a cause under review," even though the parties are prepared to concede it. MITCHELL VS. MAURER, 293 u.s. 237, 244, 79 L.Ed 338, 55 s.ct. 162 (1934) see JUDICE VS. VAIL, 430 u.s. 327, 331, 332, 51 L.Ed 2d 376,, 97 s.ct. 1211 (1977)(standing). "And if the record discloses that the lower court was without jurisdiction (SUCH AS IN THIS CASE) Appellate court will notice the defect, although the parties make no contention concerning it." see BENDER VS. WILLIAMS PORT AREAS SCHOOL DISTRICT, 475 u.s. 534, 89 L.Ed 2d 501, 106 s.ct. 1326. When the lower federal court (and therefore the United States) lacks jurisdiction. APPELLATE HAVE JURISDICTION ON APPEAL, NOT OF THE MERITS BUT MERELY FOR THE PURPOSE OF CORRECTING THE ERROR OF THE LOWER COURT IN ENTERTAINING THE SUIT. See UNITED STATES VS. CORRICK, 298 u.s. 435, 440, 80 L.Ed. 1263, 56 D. VY. 829 (1936). See also SUMNER VS. MATA, 449 u.s. 539, 547-548 n.2, 66 L.Ed. 722, 101 s.ct. 764 (1981), CITY OF KENOSHA VS. BRUNO, 412 u.s. 507, 511 37 L.Ed. 2d, 109, 93 s.ct. 2222 (1973), CLARK VS. PAUL GRAY, INC. 306 u.s. 583, 588, 83 L.Ed 1001, 59 s.ct. 744 (1939), ST. PAUL MERCURY INDEMNITY CO. VS. RED CAB CO., 303 u.s. 283, 287-288 n.10 82 L.Ed 845 58 s.ct. 586 (1939). This obligation to notice defects in a court of appeals, regarding subject matter jurisdiction, assume a special importance when a constitutional question is presented. In such cases, we must go strictly to the standing requirements to ensure that our deliberations will have benefit of adversary presentation and full development of the relevant facts. THE COURT MUST BE MINDFUL THAT THE POWERS OF THE LEGISLATURE ARE DEFINED AND LIMITED AND THAT THOSE LIMITS MAY NOT BE MISTAKEN OR FORGOTTEN. The constitution of the United States of America has been written indeed with this, the very essence of the judicial duty. See MARBURY VS. MADISON., 5 u.s. 137, 176-178, 1 cranch 137 (1803). See also, BELL VS. MARYLAND. 378 u.s. 266, 224 (1964) (Douglas J. Concurring). "A district courts are COURTS OF LIMITED JURISDICTION, WHICH HAS ONLY POWERS CONFERRED ON IT BY THIS TITLE UNDER 28 U.S.C.A.

ARTICLE III, AND CANNOT [ASSUME] JURISDICTION." see STANDARD VS. OLESEN, 74 s.ct 768 (1954) also MCNUTT VS. G.M., 56 s.ct. 789, 80 L.Ed. 1135, and THOMAS VS. GASKIEL. 62 s.ct. 673, 83 L.Ed. 111. IT IS CLEAR THAT FEDERAL JURISDICTION DOES NOT REST IN FEDERAL STATUTES THAT DO NOT INVEST EXCLUSIVE JURISDICTION. NEITHER STATUTE GOVERNING COURTS AUTHORITY NOR THE STATUTE GOVERNING THE CHARGED CRIME INVEST EXCUSIVE AUTHORITY OF THE SUBJECT MATTER TO JUSTIFY THE ABRUPT (POLICE POWER) REMOVAL OF THIS PLAINTIFF STATE JURISDICTION, BY THE FEDERAL GOVERNMENT. The court in HOUSEBAUM VS. BAUER, 120 u.s. 450 (1887), searching the language of the statute to see if jurisdiction is conferred by a statute stated: "Here we are bound by statute, and Not by statute alone, but by an act of congress, THIS OBLIGES US TO FOLLOW THE STATE STATUTE AND STATE PRACTICE. The federal courts are bound hand and foot, and are compelled and, obligated by the federal legislature to [OBEY] the state law."

[26.] Defendant contends that such rules prevail where it appears from the record that the court was without jurisdiction, of either person or subject matter. For the record, where it appears from the RECORD that the court did not have jurisdiction of the person or the subject matter, there is no conclusive presumption to preclude an injury into the fact and to prevent a declaration of the invalidity of the judgment. A record that affirmatively shows want of jurisdiction is itself, CONCLUSIVE AS THE FACT.

[27.] Defendant contends that moreover, a district court judge may and must check for the courts jurisdiction to proceed, in the pleading. He must do his own motion without waiting for the question of lawful jurisdiction to be raised by any parties involved in the proceedings. He is charged to know that the court proceedings conducted absent jurisdiction over the subject matter are legally void and subject to collateral attack. See 46 American Jurisprudence 2d Judgments 26. As a district court charged with knowledge that jurisdiction is the authority to hear and determine a specific case within a class of cases over which the court has subject matter jurisdiction, Also, awareness that his court is subject to TERRITORIAL LIMITATION AND CANNOT EXTEND. The judicial authority, which comes pursuant to an act of congress, and under which behalf the court functions. Knowing that the jurisdiction of his court is limited, and can be further limited by constitutional or statutory provisions to only part of the territory of sovereignty to which the court belongs. See American Jurisprudence 2d. Courts 115.

[28.] Defendant contends that the district court of defendants conviction is one limited and special original jurisdiction, its action must be confirmed to the particular cases, controversies, and parties over which the constitution and the laws have authorized it to act; Any proceedings without the limits prescribed is CORAM NON JUDICE AND ITS ACTIONS A NULLITY. See STATE OF RHODE ISLAND ETAL VS. COMMONWEALTH OF MASS. 37 u.s. 657 (1938). The statute designated the federal government charges, THAT IF A CRIME DOES NOT AUTHORIZE CONCURRENT JURISDICTION. See ADAMS VS. UNITED STATES. 87 L.Ed 1421. The jurisdiction to determine jurisdiction doctrine authorizes courts to issue ancillary orders while determining their own jurisdiction doctrine authorizes criminal concept, the violations of such orders, even though it may later be determined that the court lacks jurisdiction over the proceedings. [WHEN A COURT ASSUMES JURISDICTION BUT LATER

DISCOVERS THAT IT HAS NO SUBJECT MATTER JURISDICTION, THE COURT MUST TAKE APPROPRIATE ACTION, ALTHOUGH IT ACTED IN ACCORDANCE WITH ITS PREVIOUS BELIEF THAT IT HAD JURISDICTION.] see AMERICAN JURISPRUDENCE 2d COURTS 60 PAGE 377. JURISDICTION TO RENDER A JUDGMENT IN A PARTICULAR CASE OR AGAINST PARTICULAR PERSONS MAY NOT BE PRESUMED WHERE THE RECORD ITSELF SHOWS JURISDICTION HAS NOT BEEN ACQUIRED. See OLD WAYNE MUT LIFE ASSOC. VS. MCDONOUGH. 204 u.s. 8, 51 L.Ed 345, 27 s.ct. 236. Hence, a fact connected with jurisdiction to render a judgment may not be in the face of statements to the contrary in the record.

**FAILURE TO ESTABLISH FEDERAL INTERSTATE COMMERCE NEXUS**

[29.] Defendant contends that the 'U.S. Attorney' [FAILED] to inform the grand jury or the court that the federal statutory provision under which the defendant is charged failed to contain language of an interstate commerce [NEXUS]. The enumerated subsection under which the defendant is unlawfully incarcerated and detained of his liberty, possess no language, which could be construed as incorporating a commerce nexus. Thus, the language of the statute does not grant federal subject matter jurisdiction, nor grant formal notice to the accused party that an alleged violation of TITLE 18/21, also invokes an uncharged violation of the federal interstate commerce statute, even though no prohibitive acts moved beyond the borders of the sovereign state or across state lines or international borders. THE FEDERAL GOVERNMENT DOES NOT HAVE A GENERAL POLICE POWER; THEREBY A LEGITIMATE APPLICATION OF OFFENSE MAY ONLY BE APPLIED IF CONNECTED TO AN ALLEGED VIOLATION OF THE INTERSTATE COMMERCE STATUTE.

[30.] DEFENDANT CONTENDS THAT WHERE THE INSTANT MATTER IS CONCERNED, THE 'U.S. ATTORNEY' HAD FAILED AB INITIO TO ESTABLISH THAT THE SO-CALLED PROHIBITIVE CONDUCT OF DEFENDANT MOVED BEYOND THE BORDERS OF THE SOVEREIGN STATE, THUS IN CLEAR ABSENCE OF A COMMERCE CHARGE, THE GOVERNMENT HAS FAILED TO ESTABLISH FEDERAL SUBJECT MATTER JURISDICTION OVER THE 'ALLEGED' OFFENSE.

[31.] Defendant contends that under our federal system, the "states possess primary authority for defining and enforcing the precise statutory language of the act in question to determine whether it applies solely within jurisdiction of the United States. THERE SIMPLY IS NO STATUTORY LANGUAGE EXPRESSLY STATING THAT THE ACT APPLIES "EXTRA JURISDICTIONALLY." This is particularly apparent from a review of the offense violation, mentions nothing in reference to interstate commerce. It should be noted that in other criminal acts congress statutory bases such acts upon its interstate commerce, powers: see 18 U.S.C. 659, 660, 842, 844, 875, 922, 1231, 1301, 1343, 1365, 1951, 1953, 1962, 1992, 2101, 2251, 2312, 2314, 2316, 2317, - 421, 2422, and 2423. In interpreting the "ACT", the courts have determined that it must be assumed that it is a taxing measure, for otherwise it would be no law at all. It is a mere act for the purpose of regulating it is beyond the power of congress and must be regarded as invalid, just like the "child labor Act" of congress was held to be, in BAILEY VS. DREXEL FURNITURE COMPANY, 259 u.s. 20, the opinion of the court delivered by Chief Justice Taft, in NIGRO VS. UNITED STATES. 276 u.s. .

[32.] Defendant contends that the administrative procedures Act, located at 5 U.S.C. 552 ET SEQ, and the federal Register Act, located at 44 U.S.C. 1505 et seq, provide the means for determining which statutes in any given act of congress are applicable, within federal areas, and which statutes have "general" applicability within the territories, enclaves, and insular possessions, belongs to the federal United States. At 1505 (a)(1), of title 44, of the United States Code, it is found that if a statute is not published in the federal register, the application of the statutory provisions is restricted to federal agencies, or persons acting in their capacity as officers, agents, or employees of the federal government.

[33.] Defendant contends that in HOTCH VS. UNITED STATES. 212 f.2d 280 (9th cir. 1954), at p. 283, the court stated: "Under our system of Law, no act is punishable as a crime unless it is specifically condemned by the common law or by a statutory enactment of the legislature (22 C.J.S., Crim. Law, see 17). Therefore, the administrative procedure Act and the federal Register Act must be read as a part of every congressional delegation of authority unless specifically accepted. Those acts require publication, irrespective of actual notice, as a prerequisite to the "issuance" of a regulation making certain acts criminal. If certain acts have not been made crimes by duly enacted law, the knowledge of their PUNISHMENT, Therein the abuse-mentioned, defendant in the case also CHARGES THE GOVERNMENT WAS SELECTIVE BY GOING OUTSIDE ITS JURISDICTION WHICH WAS CLEARLY SPELLED OUT BY THE 99th CONGRESS 2d SESSION. In the narcotics penalties and enforcement act of 1986. In A.L.A. SCHECTER POULTRY CORP. VS. UNITED STATES. 295 u.s. 495, 550, 70 L.Ed 1570, 55 S.ct. 837, 97 ALR 947 (1935). The court struck down regulation by congress that fixed the hour and wages of individuals employed by an intrastate business because the activity being regulated to interstate commerce only indirectly. The court characterizing the distinction between 'direct' must necessarily be so, because the United States have no claim to any authority but such as the states have surrendered to them "on this the majority of justices of the supreme court agree; in principle." THE DEFENDANT NOTES TO THIS COURT THAT THE STATE JURISDICTION, WHEREIN THE ALLEGED PROHIBITIVE ACTS OCCURRED HAS NEVER SURRENDERED IT'S JURISDICTION TO PROSECUTE CRIMES TO THE FEDERAL GOVERNMENT IN DEALING IN ILLICIT OFFENSE VIOLATIONS IN ANY OF THE GEOGRAPHICAL LOCATIONS MENTIONED IN THE INSTANT INDICTMENT WHEREIN THE ALLEGED CRIME TOOK-PLACE. With the above limits of federal jurisdiction in mind, it is now necessary to consider the contemplated administrative proscription cannot subject the informed person to criminal prosecution. While ignorance of the law is no defense, it is conversely true that a law that has not been duly enacted into positive law, is not a law of general applicability and therefore, a person who does not comply with its provisions cannot be guilty of any crime.

[34.] Defendant contends that in WEI VS. ROBINSON. 246 f.2d 739 (7th Cir 1957), cert. Den. 78 s.ct. 144, 355 u.s. 879, the supreme court stated, "contents of the Federal Register and the code of federal Regulations are prima facie evidence of the original text and are required to be judicially noted." In WOLFSON VS. UNITED STATES. 492 f.2d 1386, 204 ct. 83 (1974), "When regulations are published in the federal register, they give legal notice of their contents to all who may be affected thereby." In SHAFER VS. UNITED STATES. 229 f.2d 124, cert. den. 76 s.ct. 78, 351

u.s. 931, the court stated, "The publication of a document in the federal register creates a rebuttal presumption of validity." In NORTHERN STATES POWER CO. VS. RURAL ELECTRIFICATION ADMINISTRATION. 248 f.supp. 616 (1965), the court stated, "Rules by a government agency of general applicability and published in accordance with the federal register act have force and effect of statute law and are binding on those publishing them as well as the general public until such time as they be repealed or modified. Fed. Reg. Act I. Et seq., 44 u.s.c.a. 301 et seq.

[35.] Defendant contends that in UNITED STATES VS MERSKY. 361 u.s. 431, 438 (1960), the supreme court stated: "Once promulgated, these regulations called for by the statute itself have the force of law, and violations thereof incur criminal prosecutions just as if all the details have been incorporated into the congressional language. THE RESULT IS THAT NEITHER THE STATUTE NOR THE REGULATION ARE COMPLETE WITHOUT THE OTHER, AND ONLY TOGETHER DO THEY HAVE ANY FORCE IN EFFECT; THEREFORE, THE CONSTRUCTION OF ONE NECESSARILY INVOLVES THE CONSTRUCTION OF THE OTHER, AND IN THE CONTEXT OF CRIMINAL PROSECUTIONS, THE RULE OF STRICT CONSTRUCTION MUST BE APPLIED IN THE INTERPRETATION OF AN ADMINISTRATIVE REGULATION TO WHICH PENAL CONSEQUENCES ATTACH UNDER THE STATUTE AUTHORIZING THE PROMULGATION OF THE REGULATION, CONSTRUCTION OF THE STATUTE.

[36.] Defendant contends that in UNITED STATES VS. REINIS. 794 f.2d 506 (9th cir. 1986), the court stated, "An individual cannot be prosecuted for violating the "ACT" unless he violates an implementing regulation." see also, UNITED STATES VS. TWO HUNDRED THOUSAND DOLLAR. 590 f.supp. 846 (S.D. Fla. 1984). Specifically stated at 1 C.F.R. 1., "All regulations must be published in the federal register to have general applicability and legal effect." Regulations published by the secretary at 26 C.F.R. 601-702 (ii), acknowledge the effect of failure to publish by stating, "Thus for example, any such matter which imposes an obligation and which is not so published or incorporated by reference will not adversely change or affect a persons rights."

[37.] Defendant contends that the supreme court stated in UNITED STATES VS. WELDEN. 377 u.s. 95 (1964), that, "Under 1 U.S.C. 204 (A), which provides that the United States Code establishes prima facie the laws of the United States and that when titles of the Code are enacted into positive law, the text thereof is legal evidence of the law contained therein, the very meaning of 'Prima Facie' is that the code cannot prevail over the statutes at large when the two are inconsistent. If construction of a section of the United States Code, which has not been enacted into positive law, is necessary, recourse must be had in the original statutes themselves and a changed arrangement made by codifier without the approval of congress should be given no weight. STEPHAN VS. UNITED STATES. 319 u.s. 423 (1943) BEST FOODS VS. UNITED STATES. 147 f.supp. 749, 37 cust.ct.1 (1956); PEARL VS. MOTOR VESSEL BERING EXPLORER. 373 f.supp. 927 (1974).

[38.] Defendant contends that the law provides that when implementing regulations are at variance with the statutory provision of which they are intended to promulgate that if they fail to give proper notice under the due process clause of the federal constitution or the "FAIR NOTICE", Doctrine, set out under UNITED STATES

VS. NEVERS. 7 f.3d 59 (5th cir. 1993). Administrative regulations in order to be valid must also be consistent with, and not contrary to, "The statute under which they are promulgated." UNITED STATES VS. LARIONOFF 431 u.s. 864, at 973, 97 s.ct. 2150, at 2156, 53 L.Ed. 2d, 48 at 56. A regulation beyond the scope of, or out of harmony with, underlying legislation is a mere nullity, Id. At 873 n. 12, 97 s.ct. At 2156, n.12., MANHATTEN GEN. EQUIP. CO. VS. C.I.R.., 297 u.s. at 134, NEEL VS. UNITED STATES. 266 f.supp. At 10. "To make this determination it is necessary for the court to square the regulations against the statute that it purports to implement, comparing the sphere of authority of each. WESTERN UNION TELEG. CO. VS. F.C.C. 541 f.2d, 346, 354 (3r=' cir. 1976), cert. Den. 429 u.s. 1029 (1977) an administrative regulation must be reasonably related to advancing the purpose of the enabling legislation. MORNING VS. FAMILY P. SERVICES INC. 411 u.s. 356, 369 (1973). In the framework of criminal prosecution, unclarity in the statute or a regulation issued there under is enough to resolve doubts in favor of the defendant. UNITED STATES VS. MERSKY, SUPRA.

**FATAL DEFECTS IN THE GOVERNMENT'S CHARGING INSTRUMENTS**

[39.] Defendant contends that the U.S. Attorney for the U.S. misrepresented the self-evident as self-declaring defects in the governments own charging instruments. The defendant argues that an indictment, which fails to allege all of the elements of the alleged offense, is defective and must be dismissed, where one of the elements is crucial and is in fact the sine-qua-non to the legitimate application of the subsequent charged offenses. THE LEGITIMATE APPLICATION AND CHARGING OF AN OFFENSE VIOLATION OF TITLE 18 or 21, OF THE UNITED STATES CODE, MUST BE [CONNECTED] TO AN ALLEGED VIOLATION OF THE FEDERAL INTERSTATE COMMERCE STATUTE; OTHERWISE, FEDERAL SUBJECT MATTER JURISDICTION IS MISSING. SEE UNITED STATES VS. PUPO. 841 f.2d 1235. The defendant argues that an indictment is jurisdictionally deficient, where it fails to allege, that the purported prohibitive acts upon which the subsequent counts are based affected interstate commerce, or foreign commerce. Otherwise, the indictment fails to appraise the accused-party of what he must be prepared to defend. Accordingly, an allegation of interstate commerce is jurisdictional and as such is an essential element in apprising the defendant of the Grand Jury's authority to indict under violation of Title 18/or 21. See UNITED STATES VS. YOUNG. 730 f.2d at 224 (The particular predicate for jurisdiction is an essential element of offense); UNITED STATES VS. MCCRAY. 665 f.2d 664, 678, 679 (5th cir. 1982). The constitutional rights of an accused are violated when modifications, at trial/plea or by a court of appeals acts to broaden the charge contained in the indictment, such modifications (such as a court's use of the preamble in this "act" to enlarge or confer power) contradicts the very purpose of the fifth Amendment Grand Jury requirement. See UNITED STATES VS. STIRONE. 361 u.s. 212, 4 L.Ed 2d 252, 80 s.ct. See at 273. (Expressing similar view s). The failure of the government to include in the indictment any charge that the defendants conduct affected interstate or intrastate, or any commerce was not cured by the citation of the statutes. In the sufficiency of an indictment, it is the statement of facts in the pleading rather than the statutory citation that is controlling. See UNITED STATES VS. WUCO. 535 f.2d 1225 (9th cir. 1976) cert. Den. 429 u.s. 978, 97 s.ct. 488, 50 L.Ed. 2d 586 (1976). IT IS ELEMENTARY THAT EVERY INGREDIENT OF THE CRIME MUST BE CHARGED IN THE BILL, WITH A GENERAL REFERENCE TO THE PROVISIONS

OF THE STATUTE BEING INSUFFICIENT. See HALE VS. UNITED STATES. 89 f.2d (4th cir.) And UNITED STATES VS. BERLIN. 472 f.2d. 1002, 1007 (2d cir. 1973); also UNITED STATES VS. BEARD. 414 f.2d 1014, 1017 (3rd cir.). This indictment under 18/or 21 U.S.C. violation fails to allege a [NEXUS] between defendant conduct and interstate commerce. In dealing with an indictment, That charges illicit offense within the borders and jurisdiction of the state where no alleged commerce allegation is made, defendant argues that this court should hold that a lack of commerce allegation in the indictment precludes it from considering whether a conviction under 18/or 21 U.S.C. VIOLATION can be sustained. *EVEN IF THE GOVERNMENT ALLEGED AND PROVED THAT THESE OFFENSES HAD A NEXUS TO COMMERCE. See UNITED STATES VS. LOPEZ. At 2 f.3d 1342. (The holding of the 5th cir. Court of appeals). In addition, Title's 18 U.S.C. (And 3, 21, 28) are non-positive law. It is difficult to meet it by any argument beyond this statement: An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed. NORTON VS. SHELBY CO., SUPRA. 118 u.s. 425, 441, 6 s.ct. 1121. (1886). The laws style United States Code were never enacted as laws of the United States and are incompetent, completely naked of authority to found valid criminal prosecution. Therefore, the indictment, judgment and commitment documents are invalid. The imprisonment resulting from the same is false. The Senate and House of Representatives of the United States were in fact NOT IN CONGRESS assembled on June 25, 1948 to enact anything. In fact, the congressional records clearly and positively show in volume 94, part 7, which covers pages 8229 to 9352 of the second session of the 80th congress (these records prove appositively any and all congressional assembled activity) beginning with June 15, 1948 that congress had closed its doors of business and executed a conditional adjournment from June 20, 1948 to December 31, 1948 for the year. See Vol. 94, part 7, page 9169, bottom right column, EXHIBIT-I. Members of the second session of the 80'h congress were subsequently called back to session by president Truman on July 15, 1948 by constitutional authority of Article II, section 3 of the American constitution for "Extraordinary occasion", to re-convene. See Vol. 94, part 8 EXHIBIT-II. Of the congressional record which covers pages 9253 to 10316 of the second session of the 80" congress beginning with July 26, 1948 to December 31, 1948. According to the 80" congressional record herein described, congress had adjourned on June 20, 1948 and was not scheduled to re-convene until December 31, 1948. However, for some unrevealed "Extraordinary Occasion," President Truman had congress adjourn for the year on June 20, 1948. Article I, section 5 clause 4 of the American constitution provides that: "Neither House, during the session of congress, shall, without consent of the other, adjourn for more than three(3) days, nor to any other place than that in which the two Houses shall besetting." Anything less than this is unconstitutional. How then can "congress assembled" enact a law on a specific date in which both Houses of congress were in fact engaged in MUTUAL ADJOURNMENT for the year, thus, not assembled? Congress did not, has not, and constitutionally could not enact any law when congress was not in general assembly, for example, June 25, 1948. Thus, title's 3, 18, 21, 28, and the federal magistrates act are not constitutional and cannot be positive law. "Ignorance of the law does not excuse misconduct in anyone, lea all a sworn officer of the law." In RE: McCOWAN, (1917) 177c.93, 170 p.1100. Absent publication in the

federal register, pursuant to 82 stat., 1274, the statute and its provisions are restricted to application within the District of Columbia, in Puerto Rico, in a territory, or in an insular possession (Rule 540)), and title 44 U.S.C. 1505 (a), only against federal officials, agents and employees of the "United States". Federal rules of criminal procedure: Rule 4 (d) (2), specifically states in pertinent part: "Territorial limits for federal warrants within the jurisdiction of the (federal) United States." F.R. Crim. P.: Rule 54(2) offenses outside a (federal) district or (sovereign) state: "These rules apply to proceedings for offenses committed upon high seas or elsewhere out of the jurisdiction of any particular state or district, except that such proceeding may be had in any district that is authorized by 18 U.S.C. 3238." Again, one finds a non-enacted law provision.

[40.] DEFENDANT CONTENDS THAT THE FEDERAL GOVERNMENT'S FAILURE TO ESTABLISH PROOF OF OTHER EVIDENCE OF JURISDICTION OR OWNERSHIP OVER EVERY GEOGRAPHICAL LOCATION IN THE INDICTMENT IN WHICH THE ALLEGED CRIMINAL ACTIVITIES TOOK PLACE DIVESTED THE COURT OF JURISDICTION OVER THE SUBJECT MATTER AND MANDATES REVERSAL. Where the lands were never ceded to the United States and the locations that lie within the territorial boundaries of the states and not the federal government, then the federal government lacks jurisdiction over any criminal activities, which lie therein. Thus the government's view that title 18 or 21 U.S.C. violation, can be used and applied to all crimes that occur anyplace or in any geographical location, even though the statute lacks a commerce nexus, and the government's failure to allege my effect on commerce, or other basis for jurisdiction, and not withstanding the states sovereign jurisdiction over its territory, are contrary to the constitution of the United States. Such a position would ask this court to infer that congressional laws may be converted to general police power and authority, without statutory or constitutional support, which only the states may properly possess.

[41.] Defendant contends that it is firmly established and accepted facts that the federal government's power, authority, and jurisdiction does not exceed or extend beyond the boundaries and parameters of the embodiment of the federal government itself. I.e. "Territory, lands, and property owned by the federal government over which jurisdiction has been ceded by the state legislature," However, the federal government does not have the power, nor does the constitution grant the power to punish a person for various other crimes over which jurisdiction is retained by the state. Preventing and prosecuting such various crimes is much more the business of the state than the federal government. ARIZONA VS. MANYPENNY. 451 u.s. 232, 101 s.ct. 1657. It is of the utmost importance and relevance to note, retain, and embellish within the mind that the territorial jurisdiction of the nited States is limited to the federal enclaves. UNITED STATES VS. FESSLER. 781 f.2d 384, 386 (1986). In the instant matter, the facts and offenses alleged do not conform with or meet any of the jurisdictions of the subject matter, any prosecution or continuation of this matter is unlawful at its inception and duration. To bring the offenses within the jurisdiction of the federal courts, it must have been committed out of the jurisdiction of [ANY] state; it is not the offenses committed, but rather the [PLACE] in which the offense is committed. PEOPLE VS. GODFREY. 17 johns 225 at 233. In the doctrine of "LEX LOCI" of the "LAW OF THE PLACE" determines that standard of conduct and governs as to matters within the right of action. See GRAY VS. BLIGHT. 112 f.2d 696. While no one disputes the proposition that "The

constitution created a federal government of limited powers," GREGORY VS. ASHCROFT. 501 u.s. 452, 115 L.Ed 2d 410, 111 s.ct. 2395 (1991); and that while the tenth Amendment makes explicit "That the powers not delegated to the United States by the constitution nor prohibited by it to the states, are reserved to the states respectively, or to the people."

[42.] Defendant contends that in a case like this one, the argument is the division of authority between the state and the federal government. The governments' broader reading of the governments' broader reading of these statutes would mark a major inroad into the domain traditionally left to the states. If a power is delegated to congress in the constitution (such as those enumerated), the Tenth and Eleventh Amendment expressly disclaims any reservation of that power the constitution has not conferred on congress, UNITED STATES VS. OREGON. 366 u.s. 643, 649, 6 L.Ed 2d 575, 81 s.ct. 1278 (1961). CASE VS. BOWELS. 327 u.s. 92, 102, 90 L.Ed 552, 66 s.ct 438 (1946); OKALAHOMA EX REL PHILLIPS VS. GUY F. ATKINSON CO., 313 u.s. 508, 534, 85 L.ED. 1487, 61 s.ct. 1050 (1941).

[43.] Defendant contends that in the sense that the tenth amendment "states but a truism that all is retained which has not been surrendered." UNITED STATES VS. DARBY. 312 u.s. 100, 124, 85 L.Ed. 609, 61 s.ct. 451, 132 ARL 1430 (1941). As Justice Story put it, "This Amendment is a mere affirmation of what, upon any just reasoning, is a necessary rule of interpreting the constitution. Being an instrument of limited and enumerated powers, it follows irresistible, that what is not conferred, is withheld and belongs to the state's authorities. 3.j. STORY COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 752 (1833).

[44.] Defendant contends that the federal government did not have exclusive jurisdiction over the geographical location wherein the alleged activity took place, in lands and a need building that were never ceded to the United States, the interstate commerce element becomes essential to establishing jurisdiction and prove every element of the offense. Applying the rationale of the supreme court in UNITED STATES VS. MECHANIK. 475 u.s. 66, 70, 106, s.ct. 938, 941, 89 L.Ed 2d 50 (1989) and UNITED STATES VS. HOOKER. 841 f.2d 1225, like the decision in HOOKER, defendant maintains that the harmless error analysis of MECHANIK, cannot be applied here because the court had no jurisdiction to try the defendant on a count that failed to allege an affect on inter or intrastate commerce. JURISDICTION IS LACKING IF THE INDICTMENT DID NOT ALLEGE A FEDERAL CRIME, BY MEANS, OF A CONNECTION WITH INTERSTATE COMMERCE. This action by the prosecutor would certainly deprive the defendant the basic protection, which the guaranty of the intervention of a Grand Jury was designed to secure. For the defendant could then be convicted on the basis of charges not found by and perhaps not even presented to the Grand Jury, which indicted him. See ORFIELD, criminal procedure from arrest to appeal, 243.

[45.] Defendant now asserts his fifth and sixth amendment rights of due process and equal protection in law, in arguing that he has never been indicted by his Grand Jury for affecting any commerce! Thus, failure to present this element or state it in the pleading of the indictment, preclude the court from sustaining his conviction. For all these above and herein reasons, defendant asks this court to look carefully to the constitution and cited statutes, Defendant asks this court to invoke the doctrine of stare

decisis: When a court has once laid down a principle of law applicable to a certain state of facts it will adhere to that principle, and apply it to all future cases, where facts are substantially the same regardless of whether the parties are the same. The doctrine stare Decisis, Provides the means by which courts assure that the law will not merely change erratically but will develop in principle and intelligible fashions; the doctrine permits society to presume that bedrock principles are found in law rather than in the procivilities of individuals and thereby contributes to the integrity of our constitution system of government both in appearance and in fact. Defendant now, invokes the doctrine of stare Decisis to his arguments herein; "Any departure from the doctrine of stare decisis demands special justification." ARIZONA VS. RAMSEY. 467 u.s. 203, 212, 81 L.Ed 2d 164, 104 s.ct 2305 (1984); also OREGON VS. KENNEDY. 456 u.s. 667, 691, 692 n. 34, 72 L.Ed 2d 416, 102 s.ct. 2083 (1982) Stevens J. Concurring in Judgment.

## **18 or 21 U.S.C. VIOLATION**

[46.] Defendant contends that if congress wanted any statute to be used, outside of its territorial jurisdiction, such as anywhere or any place then it would have included the interstate commerce nexus that is required. "A Federal Statute intended to be enforced within the states exceeds congress commerce clause authority." To uphold the government's contention that it can bring criminal charges committed within a state is to convert congressional authority into a police power, which is only within the authority of the states. See UNITED STATES VS. LOPEZ. No 931260, (decided April 26th 1995). In MCCULLOUGH VS. MARYLAND. 4 wheat 316 (1819), the federal government had to acknowledge that it can only exercise power granted to it. The enumerated presupposes not enumerated. See, GIBBONS VS. OGDEN. SUPRA, at 195. The constitution mandates that congress cannot create or give itself plenary police powers over the state territories. Congress must operate within the framework of what the supreme court defines the law to be. See MARBURY VS. MADISON., 1 cranch 137, 177 (1803).

[47.] Defendant contends that where the instant matter concerned, the defendant committed [NO] violation of any properly enacted and duly promulgated federal law within the legislative jurisdiction of the federal United States, [NOR] within the parameters defined under the implementing regulations for the federal sentencing provisions, thus, the sentencing provisions set out under 18 U.S.C. 3551, 3553 thru 3559 do not apply to the accused.

[48.] Defendant contends that the court will find that the statutory provisions under which the U.S. district court will impose the sentence against the accused (18 U.S.C. 3551, 3553 thru 3559). Apply not to the Acts of congress, which are applicable only in the District of Columbia. See Rule 54 (D).

[49.] Defendant contends that an invalid, unconstitutional or non-existent statute affects the validity of the "Charging Document", that is, the complaint, indictment or information. If these documents are void or fatally defective, there is no subject matter jurisdiction since they are the basis of the court's jurisdiction; when an accused party is indicted under a not yet effective or in enacted statute, the charging document is invalid.

[50.] Defendant contends that the indictment or complaint can be invalid if it is not constructed in the particular mode or form prescribed by the constitution or statute 942 C.J.S. "INDICTMENTS AND INFORMATION'S," (1 p.883). However, it also can be defective and void when it charges a violation of a law, and that law is void,

unconstitutional, un-enacted, or misapplied. If the charging document is void, The subject matter of a court does not exist. The want of a sufficient affidavit, complaint, or information goes to the jurisdiction of the court, and renders all proceedings prior to the filing of a proper instrument void ab initio. 22 CORPUS JURIS SECUNDUM, "CRIMINAL LAW," 324, p.390.

[51.] Defendant contends that one-way in which a complaint, or indictment fails to charge a crime, is by its failure to have the charge based upon a valid or duly enacted law. Complaints or indictments, which cite invalid laws, or incomplete law, or non-existent law is regarded as being invalid on their face, THUS FATALLY DEFECTIVE.

[52.] Defendant contends that the crux then of this whole issue of jurisdiction revolves around law, that is, the law claimed to be violated. If one is subject to a law, they are then under the jurisdiction of some authority. If a crime is alleged but there is no law to form the bases of that crime, there is no jurisdiction to try to sentence one even though they may be subject to the legislative body and the court. There has to be a law, a valid law, for subject matter jurisdiction to exist. Laws that lack an enacting clause are not laws of the legislative body to which we are constitutionally subject, at all. Thus if a complaint or information charges one with a violation of a law which has no enacting clause, then no valid law is cited. If it cites no valid law then the complaint charges no, and the court has no subject matter jurisdiction to try the accused-party. [N]o authority needs to be cited for the proposition that, when a court lacks jurisdiction, any judgment rendered by it is void and without any force, or effect whatsoever. BOLES. 346 f.2d. 285, 286, (1965).

[53.] Defendant contends that a judge or court may be in a legal sense immune from any claims that it is guilty of wrong because of its improper exercise of jurisdiction. However, it has no such protection where it lacks jurisdiction and [The issue has been raised and asserted.] When the lack of jurisdiction has been shown, a JUDGMENT RENDERED IS NOT ONLY VOID, BUT IS ALSO USURPATION. Jurisdiction is a fundamental prerequisite, and usurpation thereof is a nullity. 22 CORPUS JURIS SECUNDUM, "CRIMINAL LAW", 150 p. 183. The excessive exercise of authority has reference to want of power over the subject matter; the result is void when challenged directly or collaterally. If it has reference merely to the judicial method of the exercise of power, the result is binding upon the parties to the litigation until reversed the former is usurpation; the latter error in judgment. VOORHEES VS. THE BAND OF THE UNITED STATES. 35 u.s. 449, 474-75 (1936), the line which separates error in judgment from the usurpation of power is very definite. The supreme court of the United States stated: Judges shall be impartial and held accountable when judges are biased. BRACY VS. WARDEN. U.s. s.ct. #96-6113 (June 97). In addition "If a judge does not fully comply with the constitution then that judges orders are void," In re: SAWER 124 u.s. 200 (1888). He/she is without jurisdiction, and he/she has engaged in an act of treason. Also, see U.S. VS. WILL. 449 u.s. 200, 216, 101 s.ct. 471, 66 L.Ed and 392, 406 (80). Also SCHEUER VS. RHODES. 416 u.s. 232, 94 s.ct. 1683, 1687, (1974). "Void judgments are those rendered by a court which lacked jurisdiction, either of subject or the parties; and are totally void." WAHL VS. ROUND VALLEY BANK. 38 Ariz. 411, 300 p.955 (1931), TUBE CITY CO. VS. OTTERSON. 16 Ariz. 305 p.203. Also MILLIKEN VS. MAYER. 311 u.s. 457 s.ct. 339, 85 L.Ed 2nd 278 (1940), LONG VS. SHOREBANK CORP. 182 f.3d 548 (CA. 7 ILL 1999), LUBBEN VS. SELECTIVE

SERVICE BD. #27, 453 f.2d. 645, ALR Fed. 298 (CAL., MASS. 1972). "A void judgment is one which from the beginning was a complete nullity and without any legal force or effect." HOBBS VS. U.S. OFFICE MANAGEMENT. 485 f.supp. 457 (m.d. fla. 1980), HOLSTEIN VS. CITY OF CHICAGO. 803 fed. Supp. 205, 149 F.R.D. 147, affirmed 29, f.3d 1145 (92). "Void judgments are where court personnel or subject matter jurisdiction or entry of order violated fed. R. Civ. P. Rule 60(B)(4) 28 u.s.c.a. const. Amend, 5, KLUGH VS. U.S. 620 f.supp. 892(85), RUBIN VS. JOHNS. 109 f.r.d. 174 (85), WARD VS. TERRENE. 386 p.352 (63). In addition, " A void order may be attacked either collaterally or directly at ANYTIME." In re: ESTATE OF STINEFIELD 630 NE and 801, also see STINEFIELD VS. HADDICK. 5 u.s. 809 (ILL 1994). Void judgments generally fall into two classifications, that is, judgments where there is want of jurisdiction of persons or subject matter, and judgments through fraud. IRVING VS. RODRICK. 169 NE 2r" 145 (ILL. APP. 2nd 1960).

## **CONCLUSION**

[54.] The defendant stands firm on his assertion that he was highly prejudiced by the prosecutor; not qualifying the jurisdictional [NEXUS] in the statute, to the grand jury. Defendant argues that congress intent, and the statutes [TRUE] jurisdiction as seen in the offense and conviction under the indictment may not stand. A grand jury in order to make the ultimate determination, must necessarily determine, what gives the government jurisdiction to sustain, or bring these charges, to allow the prosecutor, or the court to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which guarantee of intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by a grand jury or perhaps not even presented to the grand jury which indicted him such as this case now, before this court, the jurisdictional nexus needed and required certainly was never presented to the defendants grand jury, nor the fact that the charging instruments don't apply to defendant. For similar views. See Orfield Criminal Procedure from arrest to appeal 243. This underlying principle is reflected by the settled rule in the federal courts that an indictment may not be amended except by submission to the grand jury unless the charge is merely a matter of form, EX PARTE BAIN, 121 u.s. 1, 30 L.Ed 849, 7 s.ct. 781; UNITED STATES VS. NORRIS. 821 u.s. 619, 74 L.Ed 1076, 50 s.ct. 424; STIRONE VS. U.S., 361 u.s. 212, 4 L.Ed 2d 252, 80 s.ct 270. If it lies within the province of a court to amend an indictment to suit its own notion of what ought to have been, (such as by going to the "preamble" of the statute to satisfy when the "preamble" was never presented to the grand jury). The great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to prisoner's plea/trial for a crime and without which the constitution says no person shall be held to answer, may be frittered away until it's value is almost destroyed. Any other doctrine would place the rights of the Citizens which were intended to be protected by this constitutional provision, at the mercy or control of the court or prosecuting Attorney; For if it be once held that the charges can be made by the consent or the order of the court in the body of the indictment as presented by the grand jury, and the prisoner can be called upon to answer to the indictment as thus changed, the restriction which the constitution places upon the power of the court, in regard to the prerequisite of an indictment, in reality no longer exists. EX PARTE BAIN, SUPRA. 121 u.s. at 10, 13.

[55.] Defendant contends that the government lacked federal subject matter jurisdiction where no prohibitive acts or conducts of the defendant moved beyond the borders of the sovereign state, not was the defendant indicted via the government's charging instrument, for an alleged violation of the federal interstate commerce statute, thus the federal GOVERNMENT LACKED FEDERAL SUBJECT MATTER JURISDICTION, a sine qua non to the federal Prosecution of the offenses "alleged" against the defendant.

[56.] The defendant asserts prosecutorial MISCONDUCT and plain error, 52(b) F.R.C.P., in that the application was not within the scope of Rule 7(c)(1), F.R.C.P. to the indictment in which was an amendment to cure the jurisdictional requirement; the indictment failed to explicitly, allege a nexus to commerce. See UNITED STATES VS. KNOWLES. 29 f.3d 947, 952 (5th cir. 1994).

[57.] Defendant asserts that "RES JUDICATA" consequences will not be applied to a void judgment that is one which, from its inception, is a complete nullity and without legal effect.  ALLCOCK VS. ALLCOCK. 437 N.E. 2nd 392 (ILL. APP. 3 Dist.)

[58.] Defendant contends that the district (Tribunal) court of his conviction exercised "JURISDICTION" under 18 U.S.C. 3231.  Apply not to the acts of congress, which are applicable only in the District of Columbia.  See Rule 54©).  Said court mentions nothing in reference to common law or vice-admiralty, the only two jurisdictions mentioned in the constitution, the constitution mentions nothing that could be construed as "JURISDICTION" under 18 U.S.C. 3231.  Totally absent all jurisdictions to convict this defendant.  WHOLLY VOID OF JURISDICTION.

[59.] Defendant contends that this HONORABLE court must find as a matter of law, That the defendant is in custody and detained of his liberty in violation of the constitution of the United States for the [u]nited States of America, where the foregoing and the courts own record supports that the FEDERAL GOVERNMENT LACKED FEDERAL LEGISLATIVE JURISDICTION OVER THE DEFENDANT, THE LOCUS IN QUO FROM THE BEGINNING WHEREON THE PURPORTED PROHIBITIVE ACTS WERE ALLEGED TO HAVE BEEN COMMITTED.

[60.] Defendant contends that no citizen shall be imprisoned or otherwise detained by the United States except pursuant to an ACT OF CONGRESS.  (See 18 U.S.C. 4001 (a).).

[61.] Defendant (petitioner) most humbly prays this HONORABLE court will do the correct thing and issue order of void JUDGMENT in this cause, and release defendant from UNLAWFUL CUSTODY.

WITH EXPLICIT RESERVATION OF ALL MY UNALIENABLE RIGHTS AND WITHOUT PREJUDICE TO ANY OF MY UNALIENABLE RIGHTS.

CITIZEN OF THE REPUBLIC, In Propria Persona, Sui Juris, in esse.

EXECUTED THIS /7*th* DAY OF OCTOBER 2006 C.E.

"WITHOUT PREJUDICE UCC § 1-207"

/s/ _____ *Gonzalo Murillo* _____
Gonzalo: Murillo, in esse, All Rights Reserved
Address: Currently Visiting, Terminal Island, Federal Correctional Institution

Gonzalo: Murillo
c/o # _____ , Federal Correctional Institution
Post Office Box 3007
1299 Seaside Avenue
Terminal Island, at California
               Near [90731]

Re: USDC CRIM. NO.   2:00-CR-00126-ID-CSC
    USDC CIV. NO.
    USCA APPEAL NO.

ATTACHMENTS: EXHIBITS #I, II AND III, 80th AND 91st CONGRESSIONAL RECORD
             CERTIFIED

## VERIFICATION

Under the pains and penalties of perjury, under the laws of the United States and the constitution of the United States, for the united States of America, without the united States, a public federal government corporation, and to the best of my current information, knowledge and belief, that the aforegoing is true, correct and materially certain, so help me God.

## CERTIFICATION OF SERVICE

On this /7*th* day of October 2006, copies of this instrument were caused to be placed into the United States Mail Service, to Terry Moorer and the district court.

/s/ _____ *Gonzalo Murillo* _____
Gonzalo: Murillo, in esse, All Rights Reserved, Representa
-tive for the Petitioner, GONZALO MURILLO

[Brief] MEMORANDUM OF LAW - [END]

Exhibit I

Congressional Record Volume 94 – part -7

AND CONGRESSIONAL RECORD VOLUME 84, PART 1, STYLED THE
CONTROLLED SUBSTANCES ACT, AND THE CONGRESSIONAL RECORD
FOR THE 91st CONGRESS, VOLUME 116, PART 27, WHEREIN THE
91st CONGRESS WAS NEVER IN SESSION OR ASSEMBLED ON OCTOBER
27, 1970, REQUIRED TO ENACT ANY ACT OF CONGRESS

## Left page (10)

### HISTORICAL AND STATUTORY NOTES

**Amendments**

1990 Amendments. Pub.L. 101–647, Title XXXV, § 3597, Nov.29, 1990, 104 Stat. 4931, added items 306 and 319.

1984 Amendments. Pub.L. 98–473, Title II, § 218(d)(1), Oct. 12, 1984, 98 Stat. 2027, in items 309 and 311 substituted "Repealed" for "Good time allowances" and "Parole", respectively.

Pub.L. 98–473, Title II, § 218(d)(2), Oct. 12, 1984, 98 Stat. 2027, in item 314 substituted "Repealed" for "Narcotic addicts".

. Pub.L. 98–473, Title II, § 403(b), Oct. 12, 1984, 98 Stat. 2067, in item 313 sub-

stituted "Offenders with mental disease or defect" for "Mental defectives".

1966 Amendments. Pub.L. 89–793, Title VI, § 603, Nov. 8, 1966, 80 Stat. 1450, added item "314. Narcotic addicts".

**Effective and Applicability Provisions**

For applicability of sentencing provisions to offenses, see Effective Date and Savings Provisions, etc., note, section 235 of Pub.L. 98–473, as amended, set out under section 3551 of this title.

**Savings Provisions**

See section 235 of Pub.L. 98–473, Title II, c. II, Oct. 12, 1984, 98 Stat. 2031, as amended, set out as a note under section 3551 of this title.

### CHAPTER 301—GENERAL PROVISIONS

Sec.
4001.    Limitation on detention; control of prisons.
4002.    Federal prisoners in State institutions; employment.
4003.    Federal institutions in States without appropriate facilities.
4004.    Oaths and acknowledgments.
4005.    Medical relief; expenses.
4006.    Subsistence for prisoners.
4007.    Expenses of prisoners.
4008.    Transportation expenses.
4009.    Appropriations for sites and buildings.
4010.    Acquisition of additional land.
4011.    Disposition of cash collections for meals, laundry, etc.
4012.    Summary seizure and forfeiture of prison contraband.
4013.    Support of United States prisoners in non-Federal institutions.
4014.    Testing for human immunodeficiency virus

### HISTORICAL AND STATUTORY NOTES

**Amendments**

1998 Amendments. Pub.L. 105–370, § 2(b), Nov. 12, 1998, 112 Stat. 3375, added item 4014.

1990 Amendments. Pub.L. 101–647, Title XXXV, § 3597(1), (2), Nov. 29, 1990, 104 Stat. 4931, added item for chapter 319.

1988 Amendments. Pub.L. 100–690, Title VII, § 7608(a)(2), Nov. 18, 1988, 102 Stat. 4517, added item 4013.

1984 Amendments. Pub.L. 98–473, Title II, § 1109(c), Oct. 12, 1984, 98 Stat. 2148, added item 4012.

1971 Amendments. Pub.L. 92–128, § 1(c), Sept. 25, 1971, 85 Stat. 347, substituted "Limitation on detention; control of prisons" for "Control by Attorney General" in item 4001.

1966 Amendments. Pub.L. 89–554, § 3(e), Sept. 6, 1966, 80 Stat. 610, added items 4010 and 4011.

## Right page (11)

**WESTLAW COMPUTER ASSISTED LEGAL RESEARCH**

WESTLAW supplements your legal research in many ways. WESTLAW allows you to

• update your research with the most current information

• expand your library with additional resources

• retrieve current, comprehensive history citing references to a case with KeyCite

For more information on using WESTLAW to supplement your research, see the WESTLAW Electronic Research Guide, which follows the Explanation.

### § 4001. Limitation on detention; control of prisons

(a) No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress.

(b)(1) The control and management of Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General, who shall promulgate rules for the government thereof, and appoint all necessary officers and employees in accordance with the civil-service laws, the Classification Act, as amended and the applicable regulations.

(2) The Attorney General may establish and conduct industries, farms, and other activities and classify the inmates; and provide for their proper government, discipline, treatment, care, rehabilitation, and reformation.

(June 25, 1948, c. 645, 62 Stat. 347; Sept. 25, 1971, Pub.L. 92–128, § 1(a), (b), 85 Stat. 347.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports** 1948 Acts. Based on Title 18, U.S.C., 1940 ed., §§ 741 and 753e (Mar. 3, 1891, c. 529, §§ 1, 4, 26 Stat. 839; May 14, 1930, c. 274, § 5, 46 Stat. 326).

This section consolidates said sections 741 and 753e with such changes of language as were necessary to effect consolidation.

The Classification Act, as amended," was added more clearly to express the existing practice for appointment of officers and employees as noted in letter of

the Director of Bureau of Prisons, June 19, 1944, 80th Congress House Report No. 304.

1971 Acts. House Report No. 92–116, see 1971 U.S. Code Cong. and Adm. News, p. 1435.

**References in Text**

The civil-service laws, referred to in subsec. (b)(1), are set forth in Title 5, Government Organization and Employees. See, particularly, section 3301 et seq. of that Title.



UNITED STATES          OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS
SECOND SESSION

## VOLUME 94—PART 7

JUNE 15, 1948, TO JUNE 19, 1948
(PAGES 8229 TO 9352)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948



# Congressional Record

United States
of America

## PROCEEDINGS AND DEBATES OF THE 80th CONGRESS, SECOND SESSION

## SENATE

### TUESDAY, JUNE 15, 1948

The Senate met at 11 o'clock a. m.

Rev. Bernard Braskamp, D. D., pastor of the Gunton Temple Memorial Presbyterian Church, Washington, D. C., offered the following prayer:

Almighty God, who are the guiding wisdom in the life of men and nations, we pray that Thy servants may be blessed with clear minds and courageous hearts as they take counsel together for the building of a better world. Grant unto them insight and inspiration as they frame policies and enact laws which shall lift our own beloved country into nobler and happier ways of living.

Help us to put forth a more heroic effort in behalf of a social order in which there shall be a finer spirit of brotherhood and all the members of the human family shall seek one another's welfare.

Hear us in Christ's name. Amen.

### MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Chaffee, one of its reading clerks, announced that the House had passed the following bill and joint resolution of the Senate, each with an amendment in which it requested the concurrence of the Senate:

S. 418. An act to provide for water-pollution-control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes; and

S. J. Res. 117. Joint resolution providing for acceptance by the United States of America of the Constitution of the International Labor Organization Instrument of Amendment, and further authorizing an appropriation for payment of the United States share of the expenses of membership and for expenses of participation by the United States.

The message also announced that the House had agreed to the concurrent resolution (S. Con. Res. 56) welcoming the Inter-American Bar Association to the United States for its conference in Detroit, Mich., in May 1949.

The message further announced that the House had passed the following bills, in which it requested the concurrence of the Senate:

H. R. 4462. An act authorizing the conveyance of certain lands in Park County, Wyo., to the State of Wyoming;

H. R. 5053. An act to provide for the establishment of the Independence National Historical Park, and for other purposes;

H. R. 6247. An act to provide for the air security and defense of the United States, to establish the composition of the Air Force, and for other purposes; and

H. R. 6411. An act to provide for the issuance of a special postage stamp in further-

ance of national safety against traffic and other accident hazards.

### ENROLLED BILL AND JOINT RESOLUTION SIGNED

The message also announced that the Speaker had affixed his signature to the following enrolled bill and joint resolution, and they were signed by the President pro tempore:

S. 2642. An act to amend the District of Columbia Motor Vehicle Parking Facility Act of 1942, approved February 16, 1942; and

S. J. Res. 84. Joint resolution to provide for the restoration and preservation of the Francis Scott Key Mansion, to establish the Francis Scott Key National Memorial, and for other purposes.

### THE JOURNAL

Mr. WHERRY. Mr. President, I ask unanimous consent that the Journal of the proceedings of yesterday be approved without reading.

Mr. RUSSELL. Mr. President, I desire to expedite in every possible way the business of the Senate, but I have examined the RECORD this morning, and there is considerable confusion as to the exact parliamentary status, as to what shall transpire this morning in the morning hour. I dislike to invoke the consequences of the application of rule VIII, but unless there can be arranged an appropriate unanimous-consent agreement which will carry out the seeming understanding of the Senate as to the order of business, I shall feel constrained to object to dispensing with the reading of the Journal. I should dislike very much to take that step.

Mr. WHERRY. If the Senator will yield, as I understand the parliamentary situation, the unfinished business is the so-called long-range agricultural bill. It was definitely made the unfinished business yesterday afternoon by unanimous consent, no objection being registered. So certainly the status of that bill has been cleared up. The intention this morning is to have a call of the calendar from the beginning. The reason why I did not ask unanimous consent for a call of the calendar was the fact that there are some Senators on both sides of the aisle who have bills they would like to ask to have considered and voted on, and following the adjournment taken last night the calendar would be called automatically during the morning hour. We may just as well be frank about it; that is why an adjournment was taken last night.

Mr. TAFT. I understand the Senator from Georgia has the floor. Will he yield?

Mr. RUSSELL. I have the floor, and I yield.

Mr. TAFT. Is the Senator's objection based on the fact that this is not Monday, and would the Senator be satisfied with a unanimous-consent agreement that the calendar be called as if this were Monday?

Mr. RUSSELL. If the calendar may be called for the consideration of measures to which there is no objection, with the understanding that no motion may be made to proceed to the consideration of a bill to which there is objection, I shall not insist upon the reading of the Journal.

Mr. TAFT. What is the Senator's objection to such a motion? After all, the consideration of a measure taken up on motion would come to an end at 1 o'clock. Certainly I think the Senator would have no difficulty with an agreement that the unfinished business would not be displaced during that time, if that is what the Senator is concerned about.

Mr. RUSSELL. There may be some doubt, from a reading of the RECORD of yesterday, as to what is the unfinished business. I am perfectly aware of the fact that the Chair ruled last evening that the unfinished business, or at least the business that would be before the Senate, would be the long-range agricultural bill. The Senator from Georgia was present last evening when the Senate proceeded to the consideration of the Government corporations appropriation bill, and that bill was brought before the Senate by motion. The Chair ruled last evening—not the present occupant of the chair, but the presiding officer at the time—that inasmuch as he heard no "no" votes, he considered that as being a unanimous-consent agreement. But, Mr. President, there is a great deal of difference, in parliamentary effect, between a unanimous vote of the Senate and a unanimous-consent agreement.

This matter might be submitted to the Members of the Senate on an appeal, in the present situation. I prefer to have the business of the Senate, during this period, conducted by unanimous consent. I think it will expedite the business of the Senate to a very great extent if we proceed as we have recently done, under unanimous-consent orders.

The PRESIDENT pro tempore. The situation at the moment is that the Senator from Nebraska has asked unanimous consent for approval of the Journal. The Senator from Georgia has objected, and requests the reading of the Journal.

Mr. RUSSELL. I have reserved the right to object.

Mr. HATCH. Mr. President, will the Senator from Georgia yield?

Mr. RUSSELL. I yield.

Mr. HATCH. I have just come into the Chamber, and I heard the Senator

of the Federal Communications Commission.

The PRESIDING OFFICER. Is there objection?

Mr. YOUNG. I object.

Mr. WHERRY. Then, Mr. President, I move that the nomination of Frieda B. Hennock, of New York, be confirmed.

The PRESIDING OFFICER. The question is on agreeing to the motion of the Senator from Nebraska.

Mr. BALL. Mr. President, what kind of procedure is this? We are not in executive session.

Mr. WHERRY. I asked for unanimous consent.

Mr. BALL. I did not hear any motion.

Mr. WHERRY. I understand that. I asked for unanimous consent.

The PRESIDING OFFICER. The Senator asked unanimous consent, and unanimous consent was granted.

Mr. BALL. I am sorry.

The PRESIDING OFFICER. The Chair did not understand that that is what it was for.

Mr. WHERRY. If there is any doubt about it——

The PRESIDING OFFICER. Consent was granted.

Mr. WHERRY. Very well.

Mr. BALL. Are we in executive session, then?

The PRESIDING OFFICER. We are.

Mr. WHERRY. We are, for the consideration of the nomination of Miss Frieda B. Hennock.

Mr. BALL. May we proceed in the regular order, then, and have the nomination stated, so that we will know what we are doing? I do not like to have the Senate doing things by unanimous consent. I am not going to hold up the Senate——

Mr. WHERRY. That is the very thing that is done after the Executive Calendar is taken up, and I ask that the nomination be stated.

The PRESIDING OFFICER. The clerk will state the nomination.

The LEGISLATIVE CLERK. Nomination passed over. Frieda B. Hennock, of New York, to be a member of the Federal Communications Commission.

The PRESIDING OFFICER. The question is, Will the Senate advise and consent to the nomination?

Mr. BALL. Mr. President, I do not intend to make a lengthy speech about this nomination. I am opposed to it, and I want the RECORD to show that. So far as I can discover, the only investigation, the only hearing, regarding this nomination, was a brief executive session of the subcommittee of the Committee on Interstate and Foreign Commerce. For several weeks the reports were that the nomination would never get out of committee. Then all of a sudden it was reported, with, I may say, somewhat suspicious haste. It is for a 7-year term on the Federal Communications Commission. In my opinion that is a tremendously important Commission. I think it is up to the Senate to satisfy itself—and frankly I am not satisfied; I do not know about the wisdom of the nomination one way or the other—that appointments to this

Commission will really serve the best interests of the Nation.

I myself have observed some rather disturbing things about the Federal Communications Commission. I have heard more disturbing reports since this nomination was reported. I have heard a report, on what I consider reliable authority—and obviously in the past few days I have not had any opportunity to investigate it, I do not know whether it is true or not—which indicates that certain interests, groups, who are greatly interested in this nomination, have a direct pipe line to the Federal Communications Commission, which we certainly would not want to have occur. What the score is I do not know. So far as I can determine, Miss Hennock is a lawyer from New York, and I might point out that the late President Roosevelt never appointed a member of the Federal Communications Commission from New York City, for the simple reason that New York City is the center of the radio industry, and he wanted to avoid any possibility of the industry itself having too much influence on the Commission. So far as I can discover, she has had no experience in radio matters, and from what I can learn of her background, frankly I do not think she is qualified for the job, and I want to be on record as opposed to her confirmation.

Mr. BREWSTER. Mr. President, I think the Senator from Minnesota has been very fair in his statement. As chairman of the subcommittee which investigated this nomination for the Senate Committee on Interstate and Foreign Commerce, which reported it by a vote of 8 to 0, with another member voting "present," I think the Senate should know what we have learned as to the circumstances.

Miss Hennock has been a member of the New York bar for 20 or 25 years. I hesitate to estimate the age of a lady, but I should say she is between 40 and 50 years old, so she is reasonably mature. She has had quite a brilliant record at the bar. She is a member now, which is somewhat unusual for a woman, of the third largest law firm in New York City, one of the most highly respected and distinguished, one composed almost exclusively of Republicans. She has had no experience in radio, as the Senator from Minnesota has said, which, it seemed to many of us, was perhaps most fortunate, because one who had been active in radio work, representing radio clients, would by that very fact come in under somewhat of a cloud. The committee took into consideration her breadth of experience and training and recognized abilities.

I may say that one of her most earnest sponsors was John W. Davis, of New York, who certainly is a leader of the New York bar, and who vouched most earnestly for her capacity and character. And from many other quarters there have come most earnest testimonials as to the character and competency of this woman.

Obviously only the future can tell how well she can fulfill these responsibilities. I can say that we in our committee

share the concern which the Senator from Minnesota has experienced concerning the functioning of the Federal Communications Commission. We think it needs new blood, and it was the consensus of those of us who became familiar with this matter through contact with many who were acquainted with her and through various representations, that she would be well qualified to fit into this position, and we believed her confirmation was warranted and wise.

The PRESIDING OFFICER. The question is, will the Senate advise and consent to this nomination?

The nomination was confirmed.

POSTMASTERS

EXECUTIVE REPORT OF A COMMITTEE

The following favorable report of a committee was submitted:

By Mr. LANGER, from the Committee on Post Office and Civil Service:

The nomination of Jack Bostwick to be postmaster at Bastrop, in the State of Louisiana.

On motion by Mr. LANGER, and by unanimous consent, it was

Ordered, That the said nomination be considered with those postmasters appearing on today's calendar.

Mr. BARKLEY. Does the Senator intend that the nominations of postmasters shall be considered?

Mr. WHERRY. Yes.

The PRESIDING OFFICER. The clerk will state the nominations of postmasters on the calendar.

The legislative clerk proceeded to read the nominations of postmasters on the calendar.

The PRESIDING OFFICER. Without objection, the nominations of postmasters will be confirmed en bloc.

Without objection the President will be notified of all nominations this day confirmed on the Executive Calendar.

Mr. WHERRY. Mr. President, are there any measures any Senator desires to bring up at this time, or is there any other matter that is desired to be considered?

Mr. O'MAHONEY. Mr. President, may I ask the majority leader whether there is any intention to proceed with Calendar No. 1253, Senate Joint Resolution 76?

Mr. WHERRY. That is the equal-rights amendment?

Mr. O'MAHONEY. Yes.

Mr. WHERRY. I believe the Senator who was particularly interested in the legislation stated that it would not be taken up at this time. I would not undertake to take it up.

Mr. O'MAHONEY. Very well.

CONDITIONAL ADJOURNMENT TO DECEMBER 31, 1948

Mr. WHERRY. I move that the Senate do now adjourn.

The motion was agreed to; and (at 7 o'clock and 14 minutes a. m., Sunday, June 20, 1948) the Senate adjourned, the adjournment being under the provision of House Concurrent Resolution 218, to Friday, December 31, 1948, at 12 o'clock meridian.

# COPY CERTIFICATION BY NOTARY

State of Montana      )

                           )          SS.

County of Ravalli      )

On this the __30__ day of __December__, 2004. I certify that the attached or preceding documents of __10__ page(s) is a true, exact, complete, and unaltered photocopy of _Congressional records from the Library of Congress_

☐     Presented to me by _____   **OR**

☒     An official notarial record in my possession, and that, to the best of my knowledge, the original document is neither a public record nor a publicly recordable instrument, certified copies of which are available from an official source other than a Notary Public.

_____

Verina Strank, Notary Public

VERINA STRANK
NOTARY PUBLIC-MONTANA
Residing at Hamilton, Montana
My Comm. Expires Sept 26, 2007

NOTARIAL
SEAL

Seal

**TRUE AND CORRECT COPIES OF THE ORIGINALS:**



**THE LIBRARY OF CONGRESS**
PHOTODUPLICATION SERVICE
WASHINGTON, D.C. 20540-4570



**PHOTODUPLICATION SERVICE**
202-707-5640 (VOICE)
202-707-1771 (FAX)
photoduplication@loc.gov (EMAIL)

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **UNITED STATES STATUTES AT LARGE CONTAINING THE LAWS AND CONCURRENT RESOLUTIONS ENACTED DURING THE SECOND SESSION OF THE NINETY-FIRST CONGRESS OF THE UNITED STATES OF AMERICA, 1970-1971, AND REORGANIZATION PLANS AND PROCLAMATIONS, VOLUME 84, PART 1** and that the attached photocopies – the title page and page 1236 – are a true representation from that publication.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on October 4, 2004.



By: Sandra M. Lawson
Acting Chief
Library of Congress
Photoduplication Service



# UNITED STATES
# STATUTES AT LARGE

CONTAINING THE

LAWS AND CONCURRENT RESOLUTIONS
ENACTED DURING THE SECOND SESSION OF THE
NINETY-FIRST CONGRESS
OF THE UNITED STATES OF AMERICA

## 1970—1971

AND

REORGANIZATION PLANS AND PROCLAMATIONS

———

## VOLUME 84

IN TWO PARTS

———

## PART 1

PUBLIC LAWS 91–191 THROUGH 91–525



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1971

1236                          PUBLIC LAW 91-513–OCT. 27, 1970          [84 STAT.

Public Law 91-513

October 27, 1970
[H. R. 18583]

AN ACT

To amend the Public Health Service Act and other laws to provide increased research into, and prevention of, drug abuse and drug dependence; to provide for treatment and rehabilitation of drug abusers and drug dependent persons; and to strengthen existing law enforcement authority in the field of drug abuse.

Comprehensive
Drug Abuse Pre-
vention and Con-
trol Act of 1970.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Comprehensive Drug Abuse Prevention and Control Act of 1970".

## TABLE OF CONTENTS

TITLE I—REHABILITATION PROGRAMS RELATING TO DRUG ABUSE

Sec. 1. Programs under Community Mental Health Centers Act relating to drug abuse.
Sec. 2. Broader treatment authority in Public Health Service hospitals for persons with drug abuse and other drug dependence problems.
Sec. 3. Research under the Public Health Service Act in drug use, abuse, and addiction.
Sec. 4. Medical treatment of narcotic addiction.

TITLE II—CONTROL AND ENFORCEMENT

PART A—SHORT TITLE; FINDINGS AND DECLARATION; DEFINITIONS

Sec. 100. Short title.
Sec. 101. Findings and declarations.
Sec. 102. Definitions.
Sec. 103. Increased numbers of enforcement personnel.

PART B—AUTHORITY TO CONTROL; STANDARDS AND SCHEDULES

Sec. 201. Authority and criteria for classification of substances.
Sec. 202. Schedules of controlled substances.

PART C—REGISTRATION OF MANUFACTURERS, DISTRIBUTORS, AND DISPENSERS OF CONTROLLED SUBSTANCES

Sec. 301. Rules and regulations.
Sec. 302. Persons required to register.
Sec. 303. Registration requirements.
Sec. 304. Denial, revocation, or suspension of registration.
Sec. 305. Labeling and packaging requirements.
Sec. 306. Quotas applicable to certain substances.
Sec. 307. Records and reports of registrants.
Sec. 308. Order forms.
Sec. 309. Prescriptions.

PART D—OFFENSES AND PENALTIES

Sec. 401. Prohibited acts A—penalties.
Sec. 402. Prohibited acts B—penalties.
Sec. 403. Prohibited acts C—penalties.
Sec. 404. Penalty for simple possession; conditional discharge and expunging of records for first offense.
Sec. 405. Distribution to persons under age twenty-one.
Sec. 406. Attempt and conspiracy.
Sec. 407. Additional penalties.
Sec. 408. Continuing criminal enterprise.
Sec. 409. Dangerous special drug offender sentencing.
Sec. 410. Information for sentencing.
Sec. 411. Proceedings to establish previous convictions.



# THE LIBRARY OF CONGRESS
PHOTODUPLICATION SERVICE
WASHINGTON, D.C. 20540-4570

**PHOTODUPLICATION SERVICE**
202-707-5640 (VOICE)
202-707-1771 (FAX)
photoduplication@loc.gov (EMAIL)

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **CONGRESSIONAL RECORD: PROCEEDINGS AND DEBATES OF THE 91ST CONGRESS, SECOND SESSION, VOLUME 116—PART 27 (OCTOBER 9, 1970, TO OCTOBER 14, 1970,** and that the attached photocopies – the title page, verso of the title page, and pages 36772 and 36970 – are a true representation from that work.

THIS IS TO CERTIFY FURTHER, that the publication is marked with a Library of Congress acquisition stamp that bears the date November 18, 1971.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on September 27, 2004.



By:  Sandra M. Lawson
Acting Chief
Library of Congress
Photoduplication Service

UNITED STATES



OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 91st CONGRESS
SECOND SESSION

## VOLUME 116—PART 27

OCTOBER 9, 1970, TO OCTOBER 14, 1970
(PAGES 35917 TO 37262)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1970

36772

## CONGRESSIONAL RECORD — SENATE

October 14, 1970

who have buildings or structures registered in the National Register in order to preserve such historic properties, and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. ROE:
H.R. 19778. A bill to provide increased annuities under the Civil Service Retirement Act; to the Committee on Post Office and Civil Service.

By Mr. STRATTON:
H.R. 19779. A bill to amend title II of the Social Security Act to reduce from 72 to 70 the age at which deductions on account of an individual's outside earnings will cease to be made from benefits based on such individual's wage record; to the Committee on Ways and Means.

By Mr. BURTON of California:
H.R. 19780. A bill to authorize greater uniformity of treatment of recipients under the Federal-State adult public assistance programs and to otherwise improve such programs, and for other purposes; to the Committee on Ways and Means.

By Mr. BYRNE of Pennsylvania:
H.R. 19781. A bill to provide financial benefits for certain spouses and children who are physically handicapped or mentally retarded; and for other purposes; to the Committee on Interstate and Foreign Commerce.

By Mr. HELSTOSKI:
H.R. 19782. A bill to establish a national urban bond program to provide an effective means of financing the construction of needed urban housing; to the Committee on Ways and Means.

By Mr. LONG of Maryland:
H.R. 19783. A bill to authorize the Army Corps of Engineers to collect and remove on a continuing basis accumulations of debris in the Susquehanna River; to the Committee on Public Works.

By Mr. SAYLOR:
H.R. 19784. A bill to designate certain lands as wilderness; to the Committee on Interior and Insular Affairs.

By Mr. REID of New York:
H.J. Res. 1401. Joint resolution granting the consent of Congress to the States of New Jersey and New York for certain amendments to the waterfront commission compact and for entering into the airport commission compact, and for other purposes; to the Committee on the Judiciary.

By Mr. GOODLING:
H.J. Res. 1402. Joint resolution proposing the establishment of the Dwight David Eisenhower Square in the District of Columbia; to the Committee on House Administration.

By Mr. BINGHAM (for himself, Mr. CLAY, Mr. NIX, Mr. LEGGETT, Mr. UDALL, Mr. KARTH, Mr. REES, Mr. OLSEN, Mr. ASHLEY, Mr. RYAN, Mr. HARRINGTON, Mr. OTTINGER, Mr. DADDARIO, Mr. DIGGS, Mrs. CHISHOLM, Mr. MOORHEAD, Mr. EDWARDS of California, Mr. RODINO, Mr. MOLLOHAN, Mr. MIKVA, Mr. HAWKINS, Mr. CONYERS, and Mr. STOKES):
H. Con. Res. 782. Concurrent resolution authorizing the placing of a bust or statue of Martin Luther King, Jr., in the Capitol; to the Committee on House Administration.

By Mr. BINGHAM (for himself, Mr. ANDERSON of Illinois, Mr. MEEDS, Mr. HORTON, Mr. FRASER, Mr. MORSE, Mr. ROSENTHAL, Mr. McCLOSKEY, Mr. COHELAN, and Mr. MOSHER):
H. Con. Res. 783. Concurrent resolution authorizing the placing of a bust or statue of Martin Luther King, Jr., in the Capitol; to the Committee on House Administration.

By Mr. HASTINGS (for himself, Mr. FREY, and Mr. WEICKER):
H. Res. 1254. Resolution relative to the FTS service; to the Committee on Veterans' Affairs.

By Mr. WYLIE:
H. Res. 1255. Resolution declaring that the House rejects the findings and recommendations of the Commission on Obscenity and Pornography; to the Committee on Education and Labor.

By Mr. PEPPER (for himself, Mr. ASHLEY, Mr. FRIEDEL, Mr. HARRINGTON, and Mr. SYMINGTON):
H. Res. 1256. Resolution on dismissal of professional air traffic controllers by the Federal Aviation Administration; to the Committee on Interstate and Foreign Commerce.

By Mr. RODINO:
H. Res. 1257. Resolution designating January 22 of each year as Ukrainian Independence Day; to the Committee on the Judiciary.

By Mr. WATSON:
H. Res. 1258. Resolution that the House of Representatives utterly reject and condemns the findings and recommendations of the Commission on Obscenity and Pornography and furthermore that the House of Representatives calls upon the President to reject the findings of said Commission; to the Committee on Education and Labor.

By Mr. LONG of Maryland:
H. Res. 1259. Resolution to welcome the American Association of Junior Colleges to Washington, D.C., for their 51st annual convention; to the Committee on the Judiciary.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. HALPERN:
H.R. 19785. A bill for the relief of Antonio de Leonardo; to the Committee on the Judiciary.

By Mr. HAMILTON:
H.R. 19786. A bill for the relief of Kim Huk Kyung; to the Committee on the Judiciary.

By Mr. PIKE:
H.R. 19787. A bill for the relief of Adriano Botelho Moniz; to the Committee on the Judiciary.

By Mr. SEBELIUS:
H.R. 19788. A bill for the relief of John C. Caldwell; to the Committee on the Judiciary.

By Mr. STEPHENS:
H.R. 19789. A bill for the relief of Young-dah Song; to the Committee on the Judiciary.

---

# SENATE—Wednesday, October 14, 1970

The Senate met at 9 a.m. and was called to order by Hon. THOMAS F. EAGLETON, a Senator from the State of Missouri.

The Chaplain, the Reverend Edward L. R. Elson, D.D., offered the following prayer:

Eternal Father, who hast made and preserved us a Nation, guide us and all the people in the crucial decisions of the coming days. Let all that is done be well pleasing in Thy sight. In the tumult of our times and the convulsion of human society, help us to see Thee moving in the processes of history and presiding over our destiny.

"Breathe through the pulses of desire
Thy coolness and Thy balm;
Let sense be dumb, let flesh retire;
Speak through the earthquake, wind, and fire,
O still, small voice of calm!"—Whittier.

O Lord, watch over us all during our separation. Give Thy servants strength for the contests ahead, rest and renewal before returning. And may we have peace in our hearts, peace in our land, and peace in the world.

## DESIGNATION OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication from the President pro tempore of the Senate (Mr. RUSSELL).

The legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
Washington, D.C., October 14, 1970.
To the Senate:
Being temporarily absent from the Senate, I appoint Hon. THOMAS F. EAGLETON, a Senator from the State of Missouri, to perform the duties of the Chair during my absence.
RICHARD B. RUSSELL,
President pro tempore.

Mr. EAGLETON thereupon took the chair as Acting President pro tempore.

## CALL OF THE ROLL

The ACTING PRESIDENT pro tempore. The Senate having adjourned on October 13, 1970, the Chair directs the clerk to call the roll to ascertain the presence of a

The legislative clerk called the roll, and the following Senators answered to their names:

[No. 379 Leg.]

| | | |
|---|---|---|
| Allen | Hansen | Miller |
| Bible | Harris | Mondale |
| Boggs | Hart | Proxmire |
| Byrd, W. Va. | Holland | Ribicoff |
| Cook | Hughes | Saxbe |
| Cooper | Inouye | Schweiker |
| Cotton | Jackson | Spong |
| Dole | Jordan, N.C. | Stennis |
| Eagleton | Mansfield | Talmadge |
| Ervin | Mathias | Williams, De. |
| Fulbright | McGovern | Young, Ohio |
| Griffin | McIntyre | |

Mr. BYRD of West Virginia. I announce that the Senator from North Dakota (Mr. BURDICK), the Senator from Nevada (Mr. CANNON), the Senator from California (Mr. CRANSTON), the Senator from Connecticut (Mr. DODD), the Senator from Tennessee (Mr. GORE), the Senator from Indiana (Mr. HARTKE), the Senator from Massachusetts (Mr. KENNEDY), the Senator from Minnesota (Mr. McCARTHY), the Senator from Wyoming (Mr. McGEE), the Senator from New Mexico (Mr. MONTOYA), the Senator from Utah (Mr. Moss), the Senator from

## WITHDRAWAL

Executive nomination withdrawn from the Senate, October 14, 1970:

BOARD OF GOVERNORS OF THE U.S. POSTAL SERVICE

William J. Curtin, of Maryland, to be a member of the Board of Governors of the U.S. Postal Service for a term of 1 year, which was sent to the Senate on September 28, 1970.

## ADJOURNMENT UNTIL MONDAY, NOVEMBER 16, 1970

Mr. BYRD of West Virginia. Mr. President, if there be no further business to come before the Senate, I move, in accordance with the provisions of House Concurrent Resolution 774, that the Senate stand in adjournment until 12 o'clock meridian on Monday, November 16, 1970.

The motion was agreed to; and (at 4 o'clock and 7 minutes p.m.), under the provisions of House Concurrent Resolution 774, the Senate adjourned until Monday, November 16, 1970, at 12 o'clock meridian.

## NOMINATIONS

Executive nominations received by the Senate October 14, 1970:

BOARD OF GOVERNORS OF THE U.S. POSTAL SERVICE

Elmer T. Klassen, of Massachusetts, to be a member of the Board of Governors of the U.S. Postal Service for a term of 1 year; new position.

U.S. ARMY

The following-named officers for temporary appointment in the Army of the United States to the grades indicated under the pro-

visions of title 10, United States Code, sections 3442 and 3447:

*To be major general, Medical Corps*

Brig. Gen. William Henry Moncrief, Jr., 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, Army of the United States (colonel), Medical Corps, U.S. Army).

*To be brigadier general, Medical Corps*

Col. William Bloom Maroney III, 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, Medical Corps, U.S. Army.

The following-named officers for appointment in the Regular Army of the United States to the grade indicated, under the provisions of title 10, United States Code, sections 3284 and 3306:

*To be brigadier general, Medical Corps*

Brig. Gen. Robert Morris Hardaway III; 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, Army of the United States (colonel, Medical Corps, U.S. Army).

Brig. Gen. Edward Henry Vogel, Jr., 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, Army of the United States (colonel, Medical Corps, U.S. Army).

Brig. Gen. William Henry Moncrief, Jr., 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, Army of the United States (colonel, Medical Corps, U.S. Army).

Maj. Gen. Spurgeon Hart Neel, Jr., 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, Army of the United States (colonel, Medical Corps, U.S. Army).

## CONFIRMATIONS

Executive nominations confirmed by the Senate October 14, 1970:

U.S. ARMY

The following-named officer to be placed on the retired list, in grade indicated, under the provisions of title 10, United States Code, section 3962:

*To be lieutenant general*

Lt. Gen. Jonathan Owen Seaman, 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, Army of the United States (major general, U.S. Army).

The following-named officers to be placed on the retired list, in grades indicated, under

the provisions of title 10, United States Code, section 3962:

*To be general*

Gen. Ferdinand Joseph Chesarek, 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, Army of the United States (major general, U.S. Army).

*To be lieutenant general*

Lt. Gen. Austin Wortham Betts, 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, Army of the United States (major general, U.S. Army).

U.S. NAVY

Vice Adm. Jackson D. Arnold, U.S. Navy having been designated for commands and other duties determined by the President to be within the contemplation of title 10, United States Code, section 5231, for appointment to the grade of admiral while so serving.

U.S. AIR FORCE

The nominations beginning George B. Aaron, to be major, and ending Phillip A. Johnson, to be first lieutenant, which nominations were received by the Senate and appeared in the Congressional Record on Sept. 24, 1970.

UNESCO CONFERENCE REPRESENTATIVES

The following-named persons to be representatives of the United States of America to the 16th session of the General Conference of the United Nations Educational, Scientific, and Cultural Organization:

John Richardson, Jr., of Virginia.
Louise Gore, of Maryland.
Pierre R. Graham, of Illinois.
Harold Taft King, of Colorado.
Kimon T. Karabatsos, of Virginia.

The following-named persons to be alternate representatives of the United States of America to the 16th session of the General Conference of the United Nations Educational, Scientific, and Cultural Organization:

Edward T. Brennan, of Massachusetts.
Edward O. Sullivan, Jr., of New York.
R. Miller Upton, of Wisconsin.
Tom R. Van Sickle, of Kansas.

---

# EXTENSIONS OF REMARKS

## ADDRESS BY SENATOR JENNINGS RANDOLPH TO THE AMERICAN FORESTRY ASSOCIATION

## HON. LEE METCALF
OF MONTANA
IN THE SENATE OF THE UNITED STATES

*Tuesday, October 13, 1970*

Mr. METCALF. Mr. President, "clearcutting" is a type of logging practice which is used by our public land management agencies, the Forest Service and the Bureau of Land Management. It refers to the total removal of all timber and other vegetation from a plot of land, usually followed by burning and reforestation. It is a practice which is coming under increasing opposition from concerned groups all over the country.

The word "clearcutting" is very descriptive in terms of what the countryside looks like after being subjected to this practice. The scene is one of total devastation, more like the site of a military Armageddon than that of a placid national forest. Literally nothing remains but rows of gouging "terraces" in the hillside. Anyone who knows the beauty of a forest cannot avoid a feeling of dis-

Why then allow clearcutting at all? Many conservationists, outdoorsmen, residents of affected communities, and foresters themselves are beginning to ask this question with increasing insistency. The answers which are forthcoming are not wholly satisfying, although they reveal the issue to be a complex one. The subject remains an issue of hot debate among foresters and among the public at large.

In response to the widespread public concern with this practice, many responsible public officials have asked the Federal agencies involved for a reexamination of clearcutting. The senior Senator from West Virginia (Mr. RANDOLPH) has been a leader in bringing this issue to the attention of responsible agencies.

Senator RANDOLPH has recently made a definitive statement on the subject in an address to the 95th annual conference of the American Forestry Association in Atlanta, Ga. He describes the experience of his own State of West Virginia with clearcutting, and the response of Forest Service to his request for a review. And he calls for further review by the Council on Environmental Quality for the creation of a National Forest Management Commission to oversee the

This problem is, of course, not limited to our eastern forests. It is a national issue and is of particular concern to the people of the Western States, where fragile mountain soils make up the foundation for the evergreen forests of the Rocky Mountains. Here the same practice is applied to different conditions. And the results in many cases have been equally unpleasant.

For the past several years clearcutting has been carried out on a large scale in the Bitterroot Valley of Montana to the extent that public indignation rose. Senator MANSFIELD, Representative OLSEN and I requested that the Forest Service review the clearcutting policies in the area. The Forest Service appointed a task force and gave it the broad assignment of examining the entire spectrum of forest management in the Bitterroot Valley. In the resulting study, which was released in May of this year, the task force criticized clearcutting and overcutting as it had been practiced in several parts of the area under study. It cited four goals to be pursued in future forest management plans:

First. Any lingering thought that production goals hold priority over quality of environment are erased.

Exhibit II

Congressional Record Volume 94 -- part -8

AND THE CONGRESSIONALRECORD OF THE 91st CONGRESS, VOLUME 116,
PART 28, WHEREIN CONGRESS DID NOT RECONVENE AFTER OCTOBER 14, 1970,
UNTIL NOVEMBER 16, 1970, THUS H.R. BILL 18583 WAS NEVER VOTED ON
BY THE STENATE OF THE 91st CONGRESS



UNITED STATES

OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE $80th$ CONGRESS

SECOND SESSION

## VOLUME 94—PART 8

JULY 26, 1948, TO DECEMBER 31, 1948
(PAGES 9353 TO 10316)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1948



# Congressional Record

United States
of America

PROCEEDINGS AND DEBATES OF THE 80th CONGRESS, SECOND SESSION

## SENATE

### MONDAY, JULY 26, 1948

The Senate reassembled this day in its Chamber at the Capitol, in the city of Washington, in pursuance of the proclamation of the President of the United States of the 15th day of July 1948.

ARTHUR VANDENBERG, President pro tempore, called the Senate to order at 12 o'clock noon.

Rev. Bernard Braskamp, D. D., pastor of the Gunton-Temple Memorial Presbyterian Church, Washington, D. C., offered the following prayer:

O Thou God of infallible wisdom, we have entered upon days which are fraught with perplexing problems and heavy responsibilities, but also with glorious opportunities and possibilities.

We pray that we may have the interpreting light and the clear and confident leading of Thy spirit in all our deliberations and decisions.

May the ideals and principles of our blessed Lord not only stir our emotions but our wills, and may every lofty God-inspired sentiment be translated into action and achievement.

Grant that it may be the goal of all our aspirations to glorify Thy great and holy name and to build Thy kingdom of peace and good will among men and nations.

Hear us for the sake of the Christ. Amen.

The PRESIDENT pro tempore. The proclamation of the President reconvening the Congress will be read by the clerk.

The Chief Clerk (Edward E. Mansur, Jr.) read the proclamation, as follows:

CONVENING THE CONGRESS BY THE PRESIDENT OF THE UNITED STATES OF AMERICA—A PROCLAMATION

Whereas the public interest requires that the Congress of the United States should be convened at 12 o'clock noon on Monday, the 26th day of July 1948, to receive such communication as may be made by the Executive;

Now, therefore, I, Harry S. Truman, President of the United States of America, do hereby proclaim and declare that an extraordinary occasion requires the Congress of the United States to convene at the Capitol in the city of Washington on Monday, the 26th day of July 1948, at 12 o'clock noon, of which all persons who shall at that time be entitled to act as Members thereof are hereby required to take notice.

In witness whereof, I have hereunto set my hand and caused to be affixed the great seal of the United States.

Done at the city of Washington this 15th day of July, in the year of our Lord 1948, and of the independence of the United States of America the one hundred and seventy-third.

HARRY S. TRUMAN.

By the President:
G. C. MARSHALL,
Secretary of State.

### CALL OF THE ROLL

Mr. WHERRY. I suggest the absence of a quorum.

The PRESIDENT pro tempore. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hickenlooper | O'Daniel |
| Baldwin | Hill | O'Mahoney |
| Barkley | Hoey | Pepper |
| Brewster | Holland | Reed |
| Brooks | Jenner | Revercomb |
| Butler | Johnson, Colo. | Robertson, Va. |
| Byrd | Johnson, S. C. | Robertson, Wyo. |
| Cain | Kem | Russell |
| Capehart | Kilgore | Saltonstall |
| Capper | Knowland | Smith |
| Connally | Langer | Sparkman |
| Cooper | Lodge | Stennis |
| Cordon | Lucas | Stewart |
| Donnell | McCarthy | Taft |
| Downey | McClellan | Taylor |
| Eastland | McFarland | Thomas, Okla. |
| Ecton | McGrath | Thomas, Utah |
| Ellender | McMahon | Thye |
| Feazel | Magnuson | Tobey |
| Ferguson | Martin | Umstead |
| George | Maybank | Vandenberg |
| Green | Millikin | Watkins |
| Gurney | Moore | Wherry |
| Hatch | Murray | Wiley |
| Hawkes | Myers | Williams |
| Hayden | O'Conor | Young |

Mr. WHERRY. I announce that the Senator from Minnesota [Mr. BALL], the Senator from Ohio [Mr. BRICKER], the Senator from Delaware [Mr. BUCK], the Senator from South Dakota [Mr. BUSHFIELD], the Senator from Vermont [Mr. FLANDERS], the Senator from Oregon [Mr. MORSE], and the Senator from Iowa [Mr. WILSON] are necessarily absent.

The Senator from New Hampshire [Mr. BRIDGES] is absent on official business.

The Senator from Idaho [Mr. DWORSHAK] is absent on official state business.

The Senator from New York [Mr. IVES] is absent because of illness in his family.

The Senator from Nevada [Mr. MALONE] is absent on official committee business of the Committee on Public Works.

Mr. LUCAS. I announce that the Senator from New Mexico [Mr. CHAVEZ] is unavoidably detained.

The Senator from Arkansas [Mr. FULBRIGHT], the Senator from Nevada [Mr. McCARRAN], the Senator from Tennessee [Mr. McKELLAR], the Senator from Maryland [Mr. TYDINGS], and the Senator from New York [Mr. WAGNER] are necessarily absent.

The PRESIDENT pro tempore. Seventy-eight Senators having answered to their names, a quorum is present.

### THE JOURNAL

Mr. WHERRY. Mr. President, I ask unanimous consent that, without reading, the Journal of the proceedings of the Senate for the calendar days Friday, June 18, Saturday, June 19, and Sunday, June 20, 1948, be approved.

The PRESIDENT pro tempore. Without objection, the order is made.

### ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED AFTER ADJOURNMENT

Subsequent to the adjournment of the Senate on June 20, 1948, the President pro tempore, under the authority of House Concurrent Resolution 219, signed the following enrolled bills and joint resolutions, which had previously been signed by the Speaker of the House of Representatives:

S. 165. An act for the relief of Doris E. Snyder;

S. 418. An act to provide for water-pollution-control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes;

S. 595. An act to provide that the rates of compensation for disabilities incurred in active military or naval service other than in a period of war service shall be equal to 80 percent of the rates payable for similar disabilities incurred during active service in time of war;

S. 1243. An act to provide for the payment of revenues from certain lands into the tribal funds of the Confederated Tribes of the Warm Springs Reservation of Oregon, and for other purposes;

S. 1260. An act to create a commission to hear and determine the claims of certain motor carriers;

S. 1322. An act to provide a Federal charter for the Commodity Credit Corporation;

S. 1683. An act to confer jurisdiction on the State of New York with respect to offenses committed on Indian reservations within such State;

S. 1715. An act for the relief of Archie Hamilton and Delbert Hamilton;

S. 1717. An act for the relief of the estate of William R. Stigall, deceased;

S. 1969. An act to amend the Philippine Rehabilitation Act of 1946 in connection with the training of Filipinos as provided for in title III;

S. 2217. An act conferring jurisdiction upon the Court of Claims of the United States to hear, determine, and render judgment upon the joint claims of Silas Mason Co., Inc.; Walsh Construction Co.; and Atkinson-Kier Co.;

S. 2242. An act to authorize for a limited period of time the admission into the United States of certain European displaced persons for permanent residence, and for other purposes;



# THE LIBRARY OF CONGRESS
PHOTODUPLICATION SERVICE
WASHINGTON, D.C. 20540-4570

**PHOTODUPLICATION SERVICE**
202-707-5640 (VOICE)
202-707-1771 (FAX)
photoduplication@loc.gov (EMAIL)

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **CONGRESSIONAL RECORD: PROCEEDINGS AND DEBATES OF THE 91ST CONGRESS, SECOND SESSION, VOLUME 116–PART 28, NOVEMBER 16. 1970, TO NOVEMBER 23, 1970,** and that the attached photocopies – the title page, verso of the title page, and page 37263 – are a true representation from that work.

THIS IS TO CERTIFY FURTHER, that the publication is marked with a Library of Congress acquisition stamp that bears the date January 28, 1972.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on September 27, 2004.



By:   Sandra M. Lawson
Acting Chief
Library of Congress
Photoduplication Service



UNITED STATES  OF AMERICA

Congressional Rec

PROCEEDINGS AND DEBATES OF THE 91st CONGRESS
SECOND SESSION



VOLUME 116—PART 28

NOVEMBER 16, 1970, TO NOVEMBER 23, 1970
PAGES 37263 TO 38592



# Congressional Record

**United States of America**

PROCEEDINGS AND DEBATES OF THE 91st CONGRESS, SECOND SESSION

## SENATE—*Monday, November 16, 1970*

The Senate met at 12 o'clock meridian and was called to order by the Vice President.

The Chaplain, the Reverend Edward L. R. Elson, D.D., offered the following prayer:

O God, by whose providence we have been brought to this hour, we thank Thee for Thy guiding hand upon the Nation and Thy care of those who serve Thee in this place. As we renew our work may we renew our faith in Thee.

God of our fathers and our God, we beseech Thee to draw together the diverse and discordant elements of the Nation into one united people strong in the Lord and in the power of His might. May every victory be sanctified by deeper devotion. May every defeat be redeemed by a fresh commitment to a holier servanthood. Sweep away all bitterness, heal hurt spirits, restore broken friendships, and in reconciliation and warm comradeship may the people be blessed with wise leadership.

May a mighty tide of the spirit sweep over the Nation for moral regeneration and renewal. Make us one in purpose and dedication for the healing of the nations and the making of peace with mercy and justice. To Thy servants here give abundant grace to lift high the banner of freedom and peace for all mankind.

Through Him whose love never fails. Amen.

## MESSAGES FROM THE HOUSE RECEIVED DURING ADJOURNMENT

Under authority of the order of the Senate of October 14, 1970, the Secretary of the Senate received the following messages from the House of Representatives:

On October 15, 1970:

That the House had agreed to the amendments of the Senate to the following bills:

H.R. 4182. An act to authorize voluntary admission of patients to the District of Columbia institution providing care, education, and treatment of mentally retarded persons; and

H.R. 18086. An act to authorize the Commissioner of the District of Columbia to sell or exchange certain real property owned by the District in Prince William County, Va.

On October 16, 1970:

That the Speaker had affixed his signature to the following enrolled bills, and they were signed by the Vice President on October 21, 1970, under authority of H. Con. Res. 557, as amended:

S. 2755. An act for the relief of Donal N. O'Callaghan;

S. 2846. An act to amend the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963 to assist the States in developing a plan for the provision of comprehensive services to persons affected by mental retardation and other developmental disabilities originating in childhood, to assist the States in the provision of such services in accordance with such plan, to assist in the construction of facilities to provide the services needed to carry out such plan, and for other purposes;

S. 3116. An act to authorize each of the Five Civilized Tribes of Oklahoma to popularly select their principal officer, and for other purposes;

S. 3586. An act to amend title VII of the Public Health Service Act to establish eligibility of new schools of medicine, dentistry, osteopathy, pharmacy, optometry, veterinary medicine, and podiatry for institutional grants under section 771 thereof, to extend and improve the program relating to training of personnel in the allied health professions, and for other purposes;

H.R. 4182. An act to authorize voluntary admission of patients to the District of Columbia institution providing care, education, and treatment of substantially retarded persons;

H.R. 6240. An act to amend the act entitled "An act authorizing the village of Baudette, State of Minnesota, its public successors or public assigns, to construct, maintain, and operate a toll bridge across the Rainy River at or near Baudette, Minnesota," approved December 21, 1950;

H.R. 9311. An act to declare that certain lands shall be held by the United States in trust for the Makah Indian Tribe, Washington;

H.R. 12475. An act to revise and clarify the Federal Aid in Wildlife Restoration Act and the Federal Aid in Fish Restoration Act, and for other purposes;

H.R. 14678. An act to strengthen the penalties for illegal fishing in the territorial waters and the contiguous fishery zone of the United States, and for other purposes;

H.R. 15069. An act to authorize the Thousand Islands Bridge Authority to construct, maintain, and operate an additional toll bridge across the St. Lawrence River at or near Cape Vincent, N.Y.;

H.R. 16710. An act to amend chapter 37 of title 38, United States Code, to authorize guaranteed and direct loans to eligible veterans for mobile homes and lots therefor if used as permanent dwellings, to remove the time limitation on the use of entitlement to benefits under such chapter, and to restore such entitlement which have lapsed prior to use or expiration, to eliminate the guaranteed and direct loan fee collected under such chapter, and for other purposes;

H.R. 18811. An act to authorize the Secretary of the Interior to declare that the United States holds in trust for the Eastern Band of Cherokee Indians of North Carolina certain lands on the Cherokee Indian Reservation heretofore used for school or other purposes;

H.R. 17570. An act to amend titles III and IX of the Public Health Service Act so as to revise, extend, and improve the programs of research, investigation, education, training, and demonstration authorized thereunder, and for other purposes;

H.R. 17849. An act to provide financial assistance for and establishment of a national rail passenger system, to provide for the modernization of railroad passenger equipment, to authorize the prescribing of minimum standards for railroad passenger service, to amend section 13a of the Interstate Commerce Act, and for other purposes;

H.R. 18086. An act to authorize the Commissioner of the District of Columbia to sell or exchange certain real property owned by the District in Prince William County, Virginia;

H.R. 18260. An act to authorize the United States Commissioner of Education to establish education programs to encourage understanding of policies, and support of activities, designed to enhance environmental quality and maintain ecological balance;

H.R. 18298. An act to amend the Central Valley reclamation project to include Black Butte project; and

H.R. 18583. An act to amend the Public Health Service Act and other laws to provide increased research into, and prevention of, drug abuse and drug dependence; to provide for treatment and rehabilitation of drug abusers and drug dependent persons; and to strengthen existing law enforcement authority in the field of drug abuse.

## ENROLLED BILLS PRESENTED

The Secretary of the Senate announced that, on October 21, 1970, he presented to the President of the United States the following enrolled bills:

S. 2755. An act for the relief of Donald N. O'Callaghan;

S. 2846. An act to amend the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963 to assist the States in developing a plan for the provision of comprehensive services to persons affected by mental retardation and other developmental disabilities originating in childhood, to assist the States in the provision of such services in accordance with such plan, to assist in the construction of facilities to provide the services needed to carry out such plan, and for other purposes;

S. 3116. An act to authorize each of the Five Civilized Tribes of Oklahoma to popularly select their principal officer, and for other purposes; and

S. 3586. An act to amend title VII of the Public Health Service Act to establish eligibility of new schools of medicine, dentistry, osteopathy, pharmacy, optometry, veterinary medicine, and podiatry for institutional grants under section 771 thereof, to extend and improve the program relating to training of personnel in the allied health professions, and for other purposes.

Exhibit III

Letter: Office of the Clerk U.S. House of Representatives
Washington, DC 20515-6601
Title's 18 and 21

JEFF TRANDAHL
CLERK

MARTHA C. MORRISON
DEPUTY CLERK

# Office of the Clerk
## U.S. House of Representatives
### Washington, DC 20515-6601

June 28, 2000

Mr. Charles R. Degan
Mail Stop 116012076
Building Beale B 313
1101 John Denie Road
Memphis, TN 38184

Dear Mr. Degan:

Thank you for your letter requesting information on Title 18.

In response to your inquiry, Congress was in session on June 1, 3, 4, 7-12 and 14-19, 1948, however, Title 18 was not voted on at this time. As you may know, Title 18 covers 845 pages in the U.S. Code and this wording was developed over many years. Signed copies of laws are archived at the National Archives and Records Administration and are not available to the public.

I hope that I have been of some assistance to you. For future reference, most federal depository libraries possess this type of information. For the depository library closest to you, please consult the Government Printing Office web site: www.gpo.gov/libraries.

With best wishes, I am

Sincerely,

Jeff Trandahl

JT/rs



## National Archives and Records Administration

### Office of the Federal Register

December 18, 2000

Mr. Arthur Trulock #05179-010
United Nations Federal Correctional Institution
P.O. Box 9000
Forest City, AK, 72336

Mr. Trulock

Title 21 of the <u>United States Code</u> (USC) has at no time been published, in part or in its entirety, in the <u>Federal Register</u>. The USC is maintained by the Law Revision Council, a Congressional entity. The content of the USC is comprised of permanent laws enacted and codified by Congress. To find the original laws that added or amended any of the codified material, consult the reference notes included in the volume relating to the parts or chapters you are interested in. These notes will assist you in finding the original law included in the <u>U.S. Statutes at Large</u>.

Both the USC and US Statutes at Large are available through a Federal Depository Library. If you do not have access to such a library, please consult your facility librarian to seek an interlibrary loan.

Due to personnel shortages, office policy precludes our staff from conducting lengthy research requests.

If our office can be of further assistance to you, please contact us again.

Sincerely,

Brian Swidal
Customer Service Unit
Office of the Federal Register



**G A O**
Accountability • Integrity • Reliability

United States General Accounting Office
Washington, DC 20548

November 22, 2000

Mr. Roberto Vila
No. 46413-004 W/B
Federal Correction Institution
Post Office Box 9000
Forrest City, AR 72336-7000

Dear Mr. Vila:

This is in response to your recent letter asking "has Title 21 of the U. S. Codes been enacted into positive law".

Our Office does not provide legal research services to the general public. We note, however, that Title 21 has not been enacted into "positive law", but is a codification of the statutes.

Sincerely yours,

*Kenneth R Schutt*

Kenneth R. Schutt
Supervisory Adjudicator

**Office of the Law Revision Counsel**
**U.S. House of Representatives**
**Washington, D.C.   20515**

March 1, 2000

Ricky Ricardo Daniel
21490001    UCC 1207
P.O. Box 34550
Memphis, TN 38184

Dear Mr. Daniel:

This is in response to your letter concerning Title 21 and the legal effect of that title not having been enacted into positive law. You ask two specific questions, the short answers to which are as follows:

1.  You are correct that Title 21 has not been enacted into positive law.
2.  Convictions under particular sections of Title 21 occur because it is the law of the land. Whether a title is positive or non-positive law relates to the ultimate evidentiary source for the text of a law, not to the legal effect of the provision.

Some background will help in clarifying the distinction between positive and non-positive law.

Official compilations of the laws of Congress are found in two sources: the United States Statutes at Large and the United States Code. The United States Statutes at Large, prepared by the Office of the Federal Register, provides a permanent collection of the laws of each session of Congress, chronologically arranged. They are legal evidence of the laws contained in them in any court. However, they are not easy to use because there is no attempt to arrange the laws according to their subject matter or to show the present status of an earlier law as it has been subsequently amended.

The United States Code, prepared by this Office, is a consolidation and compilation of the general and permanent laws of the United States arranged according to subject matter. It presents the permanent laws enacted by Congress in a concise and useable form by grouping them by their subject matter and by showing the present status of laws that have been amended on one or more occasions.